470 So.2d 1103 (1985)
James C. WELCH
v.
Robert D. JONES and Shirley Jones.
83-193.
Supreme Court of Alabama.
February 22, 1985.
Rehearing Denied May 10, 1985.
*1104 Ronald G. Davenport and J. Pelham Ferrell of Ferrell, Davenport & McKoon, Phenix City, for appellant.
C. Neal Pope and Paul D. Hermann of Pope, Hermann & Kellogg, Atlanta, Ga., and Sam E. Loftin, Phenix City, for appellees.
Stephen J. Pettit, Birmingham, for amicus curiae Alabama Defense Lawyers Association.

On Application for Rehearing
PER CURIAM.
Appellees' application for rehearing is granted. The original opinion is withdrawn, and the following opinion is substituted therefor.
This is an appeal from a judgment in two consolidated actions. Damages were recovered in each because of injuries suffered by Robert D. Jones from a fall while at work in the employ of James C. Welch Construction Company, a corporation. Mrs. Jone's action was for the loss of her husband's consortium.
The Joneses brought actions against United States Fidelity and Guaranty Company (USF & G), the workmen's compensation carrier; James C. Welch, president and owner of the corporate employer; and Swede Cornelius, the job superintendent. The counts charged the defendants with undertaking duties to make safety inspections and thereafter negligently failing to discover and correct or warn of the hazard that caused Mr. Jones's fall.
The claim against USF & G was dismissed on its motion for summary judgment. The remaining defendant denied negligence and alleged contributory negligence, assumption of risk, and statutory immunity from suit. After denial of numerous pretrial defense motions, the cases were tried to a jury, which returned a verdict in favor of Robert D. Jones in the amount of $800,000.00, and awarded Mrs. Jones $100,000.00. The trial court entered judgments on the verdicts and denied timely motions for J.N.O.V., a new trial, and remittiturs.
Defendant James C. Welch appeals from the final judgments and the denial of his post-trial motions.
Robert Jones was working as a carpenter for James C. Welch Construction Company on a project near Phenix City, Alabama, at the Chattahoochee Valley Community College on June 17, 1980, when he fell through an unbarricaded temporary sheet metal floor over an elevator shaft. He suffered fractures of a tibia, a vertebra, and a heel bone.
On appeal, Welch argues that Jones failed to prove Welch's assumption and breach of any duty to Jones with regard to his safety in the work place. A review of the trial transcript, however, reveals direct evidence to the contrary:
(Testimony of Torrence Webb, Loss Control Representative, USF & Gby deposition read into evidence)
"Q.... Well, let me ask you whether or not you notified James C. Welch Construction Company of the defects, and so forth, that you determine to exist on your inspections? Do you have any some procedure where you notify them?
"A. Yes, sir. We have a field report; it's handwritten.
"Q. What do you do with that?
"A. I leave a copy with the superintendent and send Mr. Welch a copy.
"Q. On this particular occasion we're talking about, on May 21st, 1980, after you made this inspection did you do a field report?

*1105 "A. Yes, sir.
"Q. And did you leave a copy there with the on-the-job supervisor, Swede Cornelius?
"A. Yes, sir.
"Q. And did you also send a copy to Mr. James C. Welch?
"A. Yes, sir.
"....
"Q.... Now, let me ask you whether or not you made certain recommendations after your May 21st, 1980, loss control visit? Did you make certain recommendations to James C. Welch and James C. Welch Construction Company?
"A. Follow-up visits?
"Q. Yes, sir.
"A. Yes, sir.
"Q. Did you telltell us, please, sir, what recommendations you made and what defects you found that existed at that time.
"A. I recommended that the first-floor perimeter have a barricade or fall protection; the stairs should have temporary handrails or barricaded for use; and also recommended that the elevator hoistway and floor openings around the interior stairwells on the first floor and TV studios should be barricaded.
"Q. All right, sir. On your visit to this job on May the 21st of 1980 you did, I assume, notice or find that the elevator hoistway, as you noted in your report, was unguarded, was open.
"A. Yes, sir.
"....
"Q. Okay. You made a recommendation in your report that it be barricaded. How was that to be done?
"A. Well, we leave that up to the discretion of the superintendent or the insured.
"....
"Q.... In addition to making the written report, did you also have a conversation with Swede Cornelius, the superintendent
"A. Yes, sir.
"Q. about the job safety and the defects you found existent?
"A. Yes, sir.
"Q. And did you discuss with him on or about May the 21st, 1980, your recommendations and defects
"A. Yes, sir.
"....
"Q. And you pointed them out to Mr. James C. Welch by sending him a copy of the field report?
"A. Yes, sir.
"....
"A. I addressed the envelopes to Mr. James C. Welch.
"Q. You didn't address them to the construction company, as such?
"A. Unh-unh.
"....
"Q. Okay. And who did you believe or who did you deal with as the safety inspector?
"A. I dealt with Mr. Welch. Generally a company that size wouldn't carry a separate safety director.
"Q. But you dealt with Mr. Welch?
"A. Yes, sir.
"Q. Did you deal with him as the safety inspector or the one who would be responsible to ensure that the safety measures were taken?
"A. Yes, sir, in a manner of speaking. It was his company and we were consulting with him.
"....
"Q. Okay. Did you send him [Welch], to his attention and address to him, did you send him the loss control reports?
"A. Yes, sir.
"Q. And why did you send them to him?
"A. Because he was the owner, I guess.
"Q. Was there any other person that was designated as the safety inspector by the company?
"A. No, sir."
Transcript, pages 46-51.
(Testimony of Plaintiff Robert Jones)

*1106 "Q. Was there any guard rail or warning or anything around the shaft of the elevator to indicate that that hole was there?
"A. No, sir, sure wasn't.
"....
"Q. Did you ever see Mr. Welch on the job?
"A. Yes, sir.
"Q. What would Mr. Welch do out there that you saw?
"A. He just come up one morning when we was running cornish [sic], and he come up on the second floor and looked around and
"....
"Q. And during that entire four days did you ever see a wooden barricade or any kind of warning around the hole in that floor?
"A. No, sir, sure didn't.
"....
"Q. Was there any barricade around that elevator shaft or any warning that that shaft was there at that time?
"A. No, sir."
Transcript, pages 104-107.
(Testimony of Swede Cornelius, Welch Construction Company Job Superintendentby deposition read into evidence)
"Q. I want you to look at the document and I want you to tell me whether or not you had a conversation with [the insurance man] on May 21st, 1980, about what he was looking at out there.
"A. I would say so. He asked me to erect rails on a particular stairwell. And I said `Mr. Welch raises all kinds of hell if I have extra materials on the job that I'm not using. I only buy what I use.'
"....
"Q. On this job did you ever get memos from Mr. Welch on safety matters?
"A. Yes.
"Q. Tell me what memos you got from Mr. Welch. Lots of them?
"A. You got memos every week, and verbally.
"Q. Involving safety?
"A. Involving everything.
"Q. All right, sir. I'm specifically referring now to safety.
"A. You didn't say `safety,' you said memos.
"Q. If I didn't, I intended to. Did you get memos from Mr. Welch during the course of this operation or this job to matters of safety?
"A. Mr. Welch inspected his jobs. If he saw something wrong he wasn't afraid to tell you.
"Q. Did Mr. Welch inspect this particular job?
"A. Mr. Welch was on that job at least once a week and sometimes twice a week.
"Q. Now, when he would come on the job would he actually go onto the construction or would he talk with you in the office or in his automobile, or what? I'm asking you.
"A. I'm going to answer you. That old coot would climb steel to look.
"Q. So he would actually go all over?
"A. You better believe it, in his $300.00 suits.
"....
"Q. And you specifically remember that Mr. Welch did that on this particular job?
"A. I particularly remember.
"Q. Now, do you recall whether or not Mr. Welch did that on the mezzanine floor of this job at any time while the mezzanine floor was up?
"A. Mr. Welch was on every floor of that job.
"Q. Would he have been on the mezzanine floor of that job, in your recollection, at any time a week or two weeks prior to this accident happening?
"A. Yes.
"Q. Did Mr. Welch discuss the barricade on the mezzanine floor with you prior to the accident happening?
"A. Yes.
"....

*1107 "A. We discussed safety and we had to do various things.
"Q. Did he discuss barricading that specific elevator shaft at any time?
"A. No, because we had done it by then.
"Q. But he did discuss safety with you, and you remember that?
"A. Always.
"....
"Q. That's what I'm talking about. Would it be a fair statement that you and Mr. Welch together were concerned about the safety of the employees on the job and that the two of you worked together to do what you could to prevent accidents occurring on that job site?
"A. I think that's a primary concern on all construction work.
"Q. But answer specifically on the question, if you can. It's yes or no.
"A. I think he was concerned and I know I was concerned.
"Q. Did you work together on that concern?
"A. We worked together on that concern and other concerns."
Transcript, pages 223-248.
(Testimony of Swede Cornelius at trial)
"Q.... Did you and Mr. Welch work together jointly on the question of safety of the employees down on the job at CVCC?
"A. I would say so.
"....
"Q. Now, Mr. Cornelius, Mr. Welch was out there inspecting that job frequently, wasn't he?
"A. That he was.
"Q. And he was that kind of bossman, wasn't he?
"A. That's right.
"Q. And he looked over the job very carefully when he came out and gave you what for about things that weren't right, didn't he?
"A. True.
"Q. That's just the way he was, isn't it?
"A. That's the way he is.
"Q. Now, you heard Mr. Jones testify that Mr. Welch was up there with him on the mezzanine floor at one time; is that correct?
"A. That's correct.
"Q. That wouldn't surprise you, would it?
"A. No.
"Q. And when he was up there on the mezzanine floor, did he come down and tell you that barricade that the USF & G man ordered you to put up was not up?
"A. Come with that again.
"Q. When Mr. Welch went up on the third, the mezzanine floor, and talked with Mr. Jones, didn't Mr. Welch come down and say to you, Swede Cornelius
"A. I can't remember that, but I can tell you what he did say on the mezzanine.
"Q. All right, sir.
"A. He walked directly to that man there and said `I want to tell you something, you're canterlevering [sic] them two-by-fours out there and you're only using one two-by-four. Preachers or dead men or cripples,' he said, `I'm not going to have it. You're going to make this safe around here for you to work on or you can go.'"
Transcript, pages 249-270.
(Testimony of Joyce Cochran, former secretary to James C. Welch)
"Q. Mrs. Cochran, you worked for Welch Construction Company for approximately eighteen or nineteen years?
"A. That's correct.
"Q. And during those eighteen or nineteen years were there occasions when someone was required to be designated as safety inspector or safety person within Welch Construction Company?
"A. Yes.
"Q. And were these jobs where records were kept which showed the person that was designated to be the safety inspector?

*1108 "A. Yes.
"Q. And was that a customary and continuous type thing?
"A. Yes, it was.
"Q. And who within Welch Construction Company was designated on those forms?
"A. Mr. Welch.
"....
"Q. And who in your recollection was always designated as safety inspector or safety director for Welch Construction Company?
"A. Mr. Welch is primarily the person to report to.
"Q. When loss control specialists or insurance men came to Welch Construction Company to talk about safety who did they talk with?
"A. Mr. Welch.
"Q. Did Mr. Welch inspect and visit the job sites to be sure that safety items had been corrected?
"A. Yes, he did."
Transcript, pages 288-89.
(Testimony of A.C. Clausell, former laborer on CVCC job)
"Q. Did you ever see Mr. Welch out there on that job site while you were working there?
"A. Yes, sir, every day."
Transcript, page 345.
(Testimony of Defendant James Welch, by deposition read into evidence)
"A.... [USF & G] make[s] safety inspections on our jobs once a month, whether they're in Macon or Savannah, or where.
"Q. As far as you remember, this job was no particular difference?
"A. No difference, no.
"Q. Have you seen those safety surveys that they made before?
"A. I see them every month.
"Q. Had you been getting those safety surveys on that particular job before this accident happened?
"A. Yes. I get them on all the jobs.
"....
"A.... And I check all my jobs myself. I don't have a field superintendent, I don't want a field superintendent, I'm a field man myself; and when I go on the job and I see a report saying that you've got to put a barricade around a stairwell or elevator shaft, I've got my eyes open to see if that superintendent has complied with what the report said. I try to do a good job of seeing that that's carried out.
"....
"A.... This is standard procedure. When we're awarded a contract we have a pre-construction conference, which is conducted by the architect, and I'm the general contractor. He asks me to have the major subcontractors present, mostly electrical, your grading contractor, mechanical contractor. The architect conducts the meeting, pretty much spells out in there what he's expecting of all parties.
And I might add thisand I didn't see it in his report but it's standard at these pre-construction conferences, that is, he'll ask, `Who are you going to delegate for safety?' And it's always the superintendent. In this case it would have been Swede Cornelius who would have been named. And this is what they expect to hear and this is what they accept; the job superintendent is responsible.
"....
"A.... I visit the job to check with the superintendent and I go there to look for things that's wrong.... If that barricade had not been thereI can't sit here and tell you yes, it was there, but if it hadn't been there I'm sure I would have noticed it and called it to Swede's attention, that `Damn it, we've got to get that barricade up.' And I'm just confident that the barricade was up or I would have noticed it and it would have been put up. But all reports I get from Swede and Scroggins is that the barricade was up. It was taken down the morning that the accident happened.

*1109 "....
"Q. And, of course, you're concerned with [safety] as president of the company.
"A. Sure I am.
"Q. Whenever you go on the job and see something that's unsafe, I believe you have already said you point it out to him and make him correct it.
"A. I point it out to him, yes."
Transcript, pages 372-397.
(Testimony of Defendant James Welch at trial)
"Q. Now, you did give Mr. Cornelius a direct order to cover this hole out there on this third floor or mezzanine floor, didn't you?
"A. I never gave him a direct order to cover that hole. We get this report from [USF & G], we send him a copy of it. When I go out on that job I have kind of a mental noteI'm going out there to look for other things. I don't get in my car just to drive out there and see if Swede has put up a barricade. I have a mental note of that, and if I see that that barricade is up there, I make no comment; but if it's not there, I want to know why.
"....
"A. You're kind of making it appear, you know, that we don't care about safety. I'm going on the job looking for everythinggood workmanship and I saw that these carpentersI don't know whether they were Jones or Smith or who they werewere building them a cantilevered rig out here that they were going to work off of to run that cornice. And they were building a trap. It would have probably lasted an hour if they got out there working. I said, `You're not going to get out there and work on that, you're going to get you another four-by-four and put under here and make it safe.' If I hadn't been interested in my people I would have cared less, but I didn't want to see these guys get out there and fall.
"So maybe that took ten minutes for me to do that. The next thing, I went on to looking at maybe some painters that were painting a wall; maybe the next thing I went to look at were my brickmasons, to see what the brickmasons were doing; I went over to see how the carpenter work was going. I'm trying to getI've got my eyes open for everything.
"Q. I understand.
"A. And I saw that he was making a trap and I stopped him.
"....
"Q. Well, in connection with safety and the way you conducted yourself in connection with safety, was it the same on the CVCC job as on the previous jobs?
"A. Sure.
"....
"Q. Mr. Welch, the day you talked with Robert Jones out there you weren't talking to the superintendent, were you?
"A. At that time I don't know where the superintendent was. I saw the danger and SwedeI got Swedehe might have been ten feet from me, but I pointed out to SwedeI don't know as I gave him, I may have gave the order to Swede, that I wasn't going to let those guysI don't know that I gave him that order, I gave it to Swede, that `These people are building a trap, they're building theirself a trap, and I want another four-by-four'I remember it well. What they had there, if they had got out on it andI would say here under oath that I gave that order to Swede, to tell those guys that that was unsafe.
"Q. Well, you were assuming the duty, though, of being involved in the safety of those people at that time, weren't you?
"A. I was doing the same thing that if I had told him, `I see some bad brickwork over here, you better get it straightened out.'
"Q. And you do that on all your jobs?

*1110 "A. All of them."
Transcript, pages 403-431.
(Further testimony of Joyce Cochran, former secretary to James C. Welch)
"Q. Mrs. Cochran, during the time you worked with James C. Welch Construction Company did any particular person within the company have primary duties with respect to safety?
"A. Yes.
"Q. Who would that person be?
"A. Mr. Welch.
"....
"Q. Mrs. Cochran, do you know of any jobs during the time you worked for James C. Welch Construction Company where a particular person was named or designated as the safety director or safety inspector for that job?
"A. Yes.
"Q. And who was that person?
"A. James Welch.
"....
"Q. When [Webb of USF & G] came to Welch Construction Company to talk to somebody about safety, who did he talk to?
"A. Mr. Welch.
"....
"Q. Do you know whether or not Mr. Welch personally did any follow-up as far as seeing that those items were corrected?
"A. Yes, I do.
"Q. Tell the jury what if anything he would do.
"A. He visited the job sites very often."
Transcript, pages 437-441.
As the foregoing testimony plainly shows, Welch routinely received notification from USF & G's loss control representative of safety defects on Welch Construction Company jobs, which reports were sent specifically to Welch himself and not simply to the company. Welch frequently visited his jobsites and either directed that safety defects be cured at the time of his inspections or sent a memo to the job superintendent setting requirements regarding the defects that he had noted on his tour of the jobsite. Webb, of USF & G, testified that he dealt personally with Welch as the safety director for Welch Construction Company. Workers testified to the frequency of Welch's visits to the jobsites and the fact that Welch would go everywhere on a site during his inspections. Welch worked with the job superintendent, Cornelius, on the safety aspects of the CVCC project, but also dealt directly with the workmen when he noted an immediate safety violation. Welch himself testified as to his direct involvement in the safety of his employees on his jobs and that his job superintendents were designated as safety directors in architects' contracts because that was "what they expect to hear and this is what they accept." Further, testified Mr. Welch, his involvement with safety is common to all of his jobs.
We reemphasize that it is neither Mr. Welch's general superintendence over the CVCC construction project nor his overall role with regard to the jobsite that imposes upon him an individual duty of due care with respect to the safety of the instant plaintiff.
"Liability of a co-employee must be predicated upon the breach of a personal duty owed to the injured employee and not upon general administrative responsibilities of the third-party co-employee defendant. It is insufficient, for example, to merely allege and prove a generalized duty of a co-employee to provide the injured employee with a reasonably safe place to work. An employee is not liable for injuries to another employee because of the failure of the employer to furnish a safe place to work or suitable appliances or instrumentalities. 57 C.J.S. Master and Servant § 578 n. 33, and accompanying text at 350.
"The burden is upon the injured party to prove with specificity the defendant's delegated or assumed duty and its breach for which recovery is sought. The position he occupies, without more, cannot serve as a basis for a co-employee's liability."
*1111 Fireman's Fund American Ins. Co. v. Coleman, 394 So.2d 334, 347 (Ala.1980) (special concurring opinion of Jones, J.).
The record of the trial is replete with evidence that Welch, the third-party defendant pursuant to § 25-5-11, Code 1975, personally assumed the duty with regard to the plaintiff's safety at the very point where the accident in question occurred and that his breach of that duty proximately resulted in the plaintiff's injuries.
Finding no error in the trial judge's failure to grant the defendant's motion for directed verdict, we affirm the judgment appealed from.
APPLICATION FOR REHEARING GRANTED; ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
TORBERT, C.J., and FAULKNER, JONES, SHORES, BEATTY and ADAMS, JJ., concur.
MADDOX and EMBRY, JJ., dissent.
MADDOX, Justice (Dissenting).
I concur in the result reached by the Court on original deliverance. Consequently, I would not grant rehearing; therefore, I respectfully dissent.
EMBRY, Justice (dissenting):
Swede Cornelius was the employer's superintendent on the jobsite and the corporate employee responsible for safety on that site. He was so designated at the preconstruction conference and in the contract documents. He controlled the day-to-day operations and reported to James C. Welch about twice each week. Cornelius was supervising his crew and overseeing subcontractors on the day of the accident.
James C. Welch is president and owner of James C. Welch Construction Company, Jones's employer. He visited the jobsite in question once or twice each week to coordinate with his superintendent and routinely received carbon copies of loss control reports from USF & G's safety inspectors.
He caused them to be forwarded to the respective responsible job superintendents, including Cornelius at this job, for action. If he happened upon an unsafe condition on a site, he called it to the attention of the superintendent, but his duties did not include responsibility for safety. Furthermore, he was not on the site on the day of the accident.
The dispositive issue in this appeal is: Did the trial court erroneously deny Welch's motion for a directed verdict for failure to show the existence of an actionable duty of care? I would answer this query in the affirmative and reverse and render.
Under the evidence in this case, Jones did not satisfy his burden to prove, with specificity, any duty of Welch owed to Jones, or assumed by Welch, and a breach of it out of which Jones's claim for recovery arose. See Clements v. Webster, 425 So.2d 1058 (Ala.1982).
For the reasons stated, I would reverse the judgments below and here enter judgment in behalf of James C. Welch.
On Application for Second Rehearing
PER CURIAM.
This Court's original opinion reversed the judgment and remanded the cause for a new trial. On appellees' application for rehearing, the original opinion was withdrawn and the judgment was affirmed. On appellant's subsequent application for rehearing, his counsel, in a respectful and professional manner, earnestly insist that this Court, in affirming the judgment, addressed only the propriety of the "directed verdict" issue (the only issue addressed in the original opinion) and omitted any reference to the remaining issues presented for appellate review. We acknowledge that, because the decision of this Court on rehearing addressed the single issue of the propriety of denying the motion for directed verdict, which was the basis of the reversal in the original decision, it might appear that the Court did not consider the remaining issues.
*1112 This is not the case, and we have again studied the original briefs and after a painstaking review of the evidence of record and the cited authorities relative to each of the issues presented, we remain of the opinion that the judgment appealed from is due to be affirmed. One issue, howeverwhether the trial court erred in not ordering a new trial on the ground of newly discovered evidenceis deserving of our treatment.
In the instant case, appellant's newly discovered evidence is the alleged testimony of a co-worker of Robert Jones who spontaneously contacted appellant's counsel after trial. Concededly, the co-worker's testimony might tend to support appellant's defense of contributory negligence. But, for appellant to prevail on his motion for new trial based on newly discovered evidence, he must show that the evidence at issue:
1) was discovered since trial;
2) could not have been discovered with the exercise of due diligence before trial;
3) is material to the issue;
4) is not merely cumulative or impeaching; and
5) is of such a nature that a differenct verdict than that already obtained probably would result if a new trial were granted.
Eastwood Lands, Inc. v. Walter Carlos Anderton, Inc., 412 So.2d 247, 249 (Ala. 1982); Forest Investment Corporation v. Commercial Credit Corporation, 271 Ala. 8, 12, 122 So.2d 131, 135 (1960).
Appellant undisputedly meets the first prerequisitethat the evidence must have been discovered since trial. Appellees do not argue that appellant discovered this witness and his testimony before or during trial. Appellees, however, do argue that appellant fails the second prerequisite that the evidence could not have been discovered with the exercise of due diligence before trial. According to appellees, if appellant had exercised due diligence in pretrial discovery, he would have discovered this witness and his testimony. The trial judge apparently agreed with appellees that appellant did not exercise due diligence, because he denied appellant's motion for a new trial.
The applicable standard of review is stated in Gilmer v. Salter, 285 Ala. 671, 676, 235 So.2d 813, 817 (1970):
"The granting or denying of a new trial on the ground of newly discovered evidence rests largely in the trial court's discretion, and its order will not be reversed on appeal, unless it appears that the court violated some legal right of the appellant, or abused its discretion; the presumption being that the discretion was properly exercised."
Although we agree that the issue of appellant's due diligence is a valid and close factual one, it is for this very reason that we cannot hold that the trial court abused its discretion in finding that the appellant failed to exercise due diligence in locating this witness and securing his testimony. Having failed to meet the prerequisites for the granting of a new trial upon newly discovered evidence, appellant is not entitled to the requested relief. We consider the affirmance previously entered in this case to be proper.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
TORBERT, C.J., and FAULKNER, JONES, ALMON, SHORES, BEATTY and ADAMS, JJ., concur.
MADDOX and EMBRY, JJ., dissent.