COOK, Justice.
Register Propane Gas Company, Inc., and its owner, Jerry Register (together referred to as “Register”), appeal from a judgment granting a new trial in a wrongful death action commenced by Era L. Whatley and Dorothy Blair, co-administratrixes of the estates of Clemmie Seymore, Sr., and his wife Emily Woodsen Seymore. We affirm.
*226 This action arose out of the deaths of Clemmie and Emily Seymore on or about December 20, 1992. The personal representatives allege that the Seymores were poisoned by carbon monoxide emanating from an unvented space heater in their mobile home. The complaint alleged that Register had negligently or wantonly installed the heater, and then had negligently supplied LP gas to it. Register challenged the plaintiffs’ theory as to the cause of the deaths, contending, instead, that the deaths were caused by a combination of heat exhaustion, poor health, and excessive use of alcohol.
The jury returned a verdict for Register, and the trial court entered a judgment on that verdict. Subsequently, the plaintiffs moved for a new trial, contending that they had “newly discovered evidence, material to the Plaintiffs, which could not, with reasonable diligence, have been discovered and produced at the trial.” After three separate hearings, the trial court set aside the judgment and granted the motion. Register appeals from the order granting a new trial.
The standard of review of an order granting a new trial on the ground of newly discovered evidence is essentially two-pronged. First, the party seeking a new trial must show that in spite of the exercise of due diligence, she did not discover the evidence until after the trial. Fries v. Acme White Lead & Color Works, 201 Ala. 613, 614, 79 So. 45, 46 (1918). Second, the evidence must be of such quality “as to render probable a different result on the retrial of the case.” Id. Moreover, “ ‘[t]he determination of whether to grant ... a new trial is for the trial judge, and an order granting or denying a motion for new trial on the basis of newly discovered evidence will not be disturbed on appeal, unless it appears that the trial court abused its discretion.’ ” Campbell v. Williams, 638 So.2d 804, 814 (Ala.1994). In the following two sections, we shall address these rules more fully.

I. Due Diligence

The newly discovered evidence at issue in this case consisted of circumstances surrounding the testing and handling of blood samples taken from the bodies of the plaintiffs’ decedents. Because Clemmie and Emily Seymore had died from an undetermined cause or causes, Alabama State Medical Examiner Dennis Stilwell performed autopsies on both bodies, drew blood samples from each, and sent the samples to the Alabama Department of Forensic Sciences in Auburn (“the DFS”). Using a process known as “microdiffusion,” “forensic scientist” Laura Shevlin tested the samples for the presence of, among other things, carbon monoxide. Shevlin found no significant carbon monoxide level in either blood sample.[1]
Before the trial of this action, both sides in the dispute determined to obtain from DFS quantities of the decedents’ blood to be tested in facilities of their choosing. The plaintiffs contacted DFS director Carlos Rabren, seeking such samples but were told that DFS had none available for release. Similarly, Register’s attorneys, who asked Laura Shev-lin, personally, for samples, were told that no blood was available. Being pressed further about the matter, however, Shevlin ultimately provided Register with blood samples. Register’s samples were sent to National Medical Services, Inc. (“NMS”), a laboratory in Philadelphia, Pennsylvania, for additional testing.
On March 30,1994, Dr. Robert Middleberg tested the blood at NMS with a spectrophotometer; this test produced a graph showing a carbon monoxide level of 29.9898% in Emily Seymore’s blood sample. On April 2, 1994, Middleberg telephoned Register’s attorney and informed him of this graph showing. However, Middleberg also stated that the graph figure was a “false positive,” and that testing on Emily’s blood was not yet completed. Indeed, on April 4,1994, personnel at NMS conducted a second spectropho-tometric test on the blood sample, resulting in a graph figure of 33.8025%. Middleberg also retested Emily’s blood using the micro-diffusion method. On or about April 4, 1994, Middleberg concluded — based, apparently, *227 on the microdiffusion results and on Ms observations of the physical characteristics of Emily’s blood — that it contained a carbon monoxide level of 2%. He concluded that Clemmie’s blood contained a carbon monoxide level of 7%.
Meanwhile, on April 2,1994, approximately 36 hours before the trial was scheduled to begin, Register’s attorney telephoned the plaintiffs’ counsel and apprised him, for the first time, that Register had commissioned these independent tests. Register’s attorney stated that the testing on Emily Seymore’s blood had not been completed, but that he would “produce the documents from NMS.” Brief of Appellee, at 18.
The trial began on April 4, 1994. During the trial, Dr. MIddleberg testified in person and submitted a three-page report containing his conclusions regarding the level of carbon monoxide in the body of each decedent. On April 7, 1994, the jury returned a verdict for Register.
On April 12, 1994, the plaintiffs moved for an order requiring DFS to provide them with samples of blood. On April 15,1994, the trial court ordered DFS to “produce to [the] Plaintiffs’ attorneys the Seymore blood samples and one or more control samples taken from the same time period in a manner similar to the manner in which the blood samples were produced to the Defendant’s attorney by Ms. Shevlin.” (Emphasis added.)
The transfer of these samples from Shevlin to the plaintiffs’ attorney was recorded on a videotape, wMch depicts the samples in plastic containers. The samples were then sent to Alabama Reference Laboratories, Inc. (“ARL”), for testing. According to ARL’s tests, Emily Seymore’s blood and Clemmie Seymore’s blood contained carbon monoxide levels of 9.6% and 5.3%, respectively.
The circumstances under wMch the plaintiffs became aware of the availability of the blood samples and became aware of the containers in wMch they were being stored and transferred are significant in regard to the first prong of the new-trial standard. It is not disputed that the plaintiffs learned only after the trial that DFS was storing or sMp-ping blood samples in plastic containers. The significance of the manner of containment and shipping will be discussed more fully in Part II.
Moreover, although the plaintiffs eventually — with the aid of a post-trial court order— were able to obtain blood samples from DFS, they can scarcely be charged with failure to exercise due diligence, given that the director misled them. In other words, the plaintiffs can hardly be faulted for failing to subpoena samples that they reasonably could have believed did not exist. Thus, we conclude that the first prong of the test is satisfied.

II. Probability of a Different Result on Retrial

As “corollaries” to the second prong of the new-trial test, “the courts have [stated] ...: (a) That the newly discovered evidence must be material and competent to the issue of fact originally tried; (b) that it must be not merely impeaching evidence; (e) that it must not be merely cumulative.” Fries v. Acme White Lead & Color Works, 201 Ala. 613, 614, 79 So. 45, 46 (1918). See also Welch v. Jones, 470 So.2d 1103 (Ala.1985). Satisfaction of these requirements tends to ensure that the retrial of the cause will not be a waste of time and resources. For the following reasons, we conclude that these requirements are satisfied in tMs case.
As to the first corollary, we note that the primary evidence material to the argument for a new trial is the videotape of the delivery of the samples to the plaintiffs’ attorney. The materiality of that evidence lies in the manner in wMch the samples were stored at, and the manner in wMch they were sMpped from, DFS. In this connection, the plaintiffs submitted the affidavit of Dr. Joseph L. Burton, identified as the “cMef medical examiner for [certain] counties in metropolitan Atlanta, Georgia.” He testified as follows:
“The method in wMch Ms. Shevlin maintained these blood samples that were furnished to the parties was not the recommended method of preserving blood for ... carbon monoxide determination. The proper way to preserve such samples is to place blood in a vaeutainer or a tightly stoppered container with a preservative, *228 such as sodium fluoride. Any test run to determine carbon monoxide on samples taken from these plastic bottles most probably would not be reliable, especially blood that has remained in those plastie bottles for sixteen months.
“In my professional opinion, the test results performed [sic] by National Medical Services and by Alabama Reference Lab do not support Laura Shevlin’s negative test results. In fact, they refute Ms. Shev-lin’s testimony.
“Virtually nothing can cause blood to produce carbon monoxide. Thus, if Ms. Shevlin’s original tests were accurate, and the Seymores had not been exposed to carbon monoxide, nothing could have happened during the sixteen months between the deaths and these final tests that would produce carbon monoxide in the blood. The fact that unpreserved, deteriorated blood is positive for carbon monoxide shows that Ms. Shevlin’s original tests were wrong and that the subsequent tests by National Medical Services and Alabama Reference Laboratory totally contradict her original test results.
“In light of the fact that the blood tests were performed some sixteen months after the deaths of the Seymores, in my opinion, the carbon monoxide level in the Seymores at the time of their deaths, reasonably would have been much higher than that shown by Alabama Reference Lab or National Medical Services.
“At the trial, I testified, in substance, that Ms. Shevlin’s blood tests should be disregarded. Now I am firmly convinced ... that her test results were inaccurate. After seeing how the blood was preserved for the purpose of the tests by National Medical Services and Alabama Reference Laboratory, and in light of the tests run by those two labs, I am firmly convinced that the Seymores died of carbon monoxide poisoning.”
(Emphasis added.) Additionally, Register, himself, introduced an article from a professional journal stating: “Postmortem carbon monoxide (saturation) may remain stable for at least 4 months in sealed vials. However, if the blood vial is not tightly sealed, the CO may be lost. These losses can be best explained by passive diffusion of CO gas....” The Effects of Storage Conditions on the Stability of Carbon Monoxide in Postmortem Blood, Journal of Analytical Toxicology, Sept.-Oct.1985, at 202, 205.
As this evidence demonstrates, the videotape interjected an entirely new theory as to the relevance of any of the various test results. At the trial, the evidence bearing most persuasively, perhaps, on the cause of death — the primary issue in the case — was the evidence of the blood test results, which tended to negate carbon monoxide as the cause. Under the facts as presented at that time, the tests performed by NMS and Dr. Middleberg appeared to reinforce Shevlin’s results, even though Dr. Middleberg detected more carbon monoxide in the blood of the decedents than did Shevlin. However, because carbon monoxide apparently does not spontaneously materialize in blood, under the theory provoked by the videotape the presence — -in allegedly improperly preserved samples — of significant carbon monoxide levels, strongly suggested, for the first time, that Shevlin’s tests were flawed. In other words, the theory goes, storing and shipping blood in the plastic containers depicted in the videotape allowed an indeterminate volume of carbon monoxide to dissipate, effectively nullifying all the tests.
The logical result of the videotape evidence was thus to negate the blood samples as factors for consideration. The result of this new evidence, if believed by the jury, would posture the cause as if no blood samples had been taken in the first instance. The negation of blood test evidence would leave the jury with nothing but the general circumstances surrounding the deaths and the testimony of several witnesses, including Alabama State Medical Examiner Dennis Stilwell. He explained that he had initiated the carbon monoxide testing because, in his physical examinations of the bodies, he had “detected a slight pinkish tint to the bodies, which,” he stated, “is also suspect to carbon monoxide poisoning.” Moreover, he stated that he had been “surprised” by the negative results of Shevlin’s tests and that he could determine no other cause of the deaths.
*229 Finally, where the newly discovered evidence “tends to destroy or obliterate the effect of the evidence upon which the verdict rested it is more than impeaching for ... its tendency would be to defeat the verdict returned.” Reynolds v. City of Birmingham, 29 Ala.App. 505, 507, 198 So. 360, 362 (1940) (emphasis added). Such is the evidence in this case.
In short, we cannot say that the trial court abused its discretion in granting a new trial. Consequently, the new trial order is affirmed.
AFFIRMED.
SHORES, KENNEDY, and INGRAM, JJ., concur.
ALMON, J., concurs in the result.
HOOPER, C.J., and MADDOX, HOUSTON, and BUTTS, JJ., dissent.

. Several weeks after the first tests were conducted, Shevlin retested the samples using a "propane analysis” and a "spectrophotometer.” These additional procedures also failed to reveal the presence of a significant amount of carbon monoxide in either sample.