These are consolidated appeals by defendants C.D. Clark, Coby Clark, Gerald McLeod, and the Continental Insurance Companies ("Continental") from jury verdicts based on personal injuries of the plaintiff, Kenneth Floyd, that allegedly resulted from negligent inspection and co-employee liability. We reverse and remand.
The record in this case established the following facts:
Plaintiff Floyd was an employee of Clark Construction Company. He began working with the company as a laborer on a jobsite near Andalusia in April or May 1982. After approximately three months, Clark Construction Company sent him to a Tuscaloosa jobsite, where he worked for an additional month. In Tuscaloosa, he performed the job of a "leads man."
The duties of a leads man pertain to the installation of pilings for bridges and overpasses. When a piling is to be driven, it is placed by a crane into a steel guide called a "leads," which holds the piling in a vertical position while the piling is driven into the ground. The leads has welded to its back a ladder that the leads man must climb whenever a piling is hoisted by a crane into the leads. Having positioned the piling into the leads, the leads man helps the crane operator position a "follow block" onto the top of the piling. A hydraulic hammer strikes this follow block and drives the piling into the ground.
Once the follow block is lowered onto the piling, the leads man must disconnect the cable from the piling and pull the cable downward until it reaches the ground, so that another workman can tie it off out of the way of the crane and the hammer. Pursuant to the standard operating procedure, once he has completed his task, the leads man climbs down the ladder 40 feet to the ground.
While at the Andalusia jobsite, plaintiff Floyd had watched the operation of another leads man on two occasions. In both instances, the leads man returned to the ground by way of the ladder.
At the Tuscaloosa jobsite, Floyd performed the job of leads man from 20 to 40 times. In about half of these operations, Floyd climbed up the ladder, untied the cable, and then climbed down the ladder. However, during the other half of the operations, Floyd "rode" the cable down to the ground, i.e., holding onto the cable, he stepped off the piling and the crane operator lowered him to the ground. Floyd never saw any other employee of the company ride the cable down to the ground, nor did anyone ever instruct him as to the propriety of such a procedure. On the other hand, Floyd contends that no one in Tuscaloosa ever stopped him or instructed him to refrain from this practice.
After his service in Tuscaloosa, Floyd was sent by Clark Construction Company to Pickens County on a bridge construction job, where he worked with defendants Coby Clark and Gerald McLeod. Coby Clark was the crane operator and Gerald McLeod was the job superintendent. Another employee, Willie Taylor, who is not a party to this action, was also a member of this crew. The final person at the Pickens County jobsite was Johnny Franks, a project inspector for the Alabama Highway Department, who was there to verify that the job was carried out according to the state's specifications.
The injuries to Floyd, which resulted in this action, occurred on September 7, 1982, Floyd's first day on the site in Pickens County. Willie Taylor was the leads man for the first piling; Floyd was the leads man on the second and third pilings. On the first and second pilings, both Taylor and Floyd climbed down the ladder after completing their tasks.
During Floyd's second operation as a leads man that morning (the crew's third piling operation), Floyd disconnected the cable from the piling and looked down at McLeod, who was standing on the ground at the bottom of the leads and told McLeod *Page 1312 
that he was going to ride the cable down. McLeod told Floyd not to ride the cable down. Coby Clark could not hear McLeod and Floyd's conversation from his seat inside the cab of the crane. Floyd then nodded to Clark, who nodded back. Clutching the cable hook to his chest, the plaintiff stepped off the piling.
The plaintiff expected the line to be taut and that he would be suspended in the air until Clark lowered him to the ground. Instead, the cable had from one to four feet of slack in it. When he stepped off the leads, Floyd immediately dropped the distance of this slack. Once the slack was pulled out of the cable, it jerked, causing Floyd to lose his grip and to fall approximately 30 feet to the ground, resulting in his injuries.
The plaintiff testified that he did not notice the slack in the cable, even though his view of the cable and the drum on which it was wound was unobstructed. He also admitted that he knew he was 40 feet above the ground and had grease on his hands when he stepped off the piling.
Floyd had never ridden the cable down with this crane operator, nor had Clark been at the Tuscaloosa site when the plaintiff had purportedly ridden the cable down to the ground. Nevertheless, Floyd contended that it was generally well-known in the company that he would ride the cable down from the piling.
Floyd also testified that sometime that morning, prior to the accident, he had told Clark that he was going to ride the cable down from the top of the leads, to which, according to the plaintiff, Clark did not object. Coby Clark, in his testimony, denied that this conversation ever took place. On cross-examination, the plaintiff admitted that he had assumed that Clark knew how to let him down with the cable and that he had neither asked Clark if he knew how to do it nor offered him any instructions about it.
Coby Clark testified that he created from one to four feet of slack in the line before the plaintiff had disconnected the cable from the piling. Clark stated that the slack made it easier for Floyd to disconnect the cable. Clark also testified that he had applied a brake onto the cable in order to prevent any further release of the line.
Billy Biles, an expert witness called by the defendants, testified that Coby Clark's actions in applying the brake to this line were in accord with industry standards. His testimony, however, did not directly address the propriety of Clark's creating the slack in the line.
Floyd's allegations against Continental averred that the insurance company:
 "maintained the worker's compensation liability insurance coverage on said company and that Continental maintained said insurance coverage for a considerable period of time prior to September 7, 1982; that pursuant to representations contained in said defendants' advertising and promotion of its worker's compensation insurance and in compliance with the terms of its worker's compensation insurance and in compliance with the terms of its insurance policy covering said company, Continental undertook to inspect said work site in order to render a safety engineering service to said company; that one or more of Continental's employees, acting within the line and scope of his or their employment for Continental, on one or more occasions, prior to September 7, 1982, entered said job site and area for purposes of inspection and safety engineering; but that on said occasion or occasions, negligently failed to perform said inspection and safety engineering service properly; that Continental negligently failed to advise plaintiff's employer to correct an unsafe and dangerous condition, to-wit: there was no headache ball on crane and grease was on chain of crane, and that Continental's employee or employees either knew of the unsafe and dangerous condition and practices or should have known it by the exercise of reasonable diligence."
Allegations of damage followed.
Plaintiff's allegations against C.D. Clark, president of Clark Construction Company, were these:
 "Plaintiff avers that defendant, C.D. Clark, then and there and for several *Page 1313 
months prior thereto was an employee of Clark Construction Company and was charged with the responsibility of the works, ways, machinery and safety precautions involved at said job site.
 "Plaintiff further avers that said defendant had on occasion prior to the injury of the plaintiff been apprised that there was no headache ball on said crane and that there was grease on the chain and that the crane was in a dangerous condition, and that despite said knowledge on the part of said defendant, he negligently and/or wantonly failed to properly and adequately warn, instruct or otherwise correct the dangerous situation so as to prevent the dangerous and unsafe condition as aforesaid, and as a proximate result and consequence of the negligent and/or wanton conduct of the said defendant, plaintiff was injured and damaged. . . ."
Plaintiff adopted these allegations of negligence against Coby Clark, the crane operator, and Gerald McLeod, the job superintendent who supervised plaintiff Floyd and Coby Clark.
The defendants answered with general denials and averments of contributory negligence and assumption of risk. The case was tried to a jury. After plaintiff rested, each defendant moved for a directed verdict, but the trial court denied these motions. Like motions were made and denied at the close of all the evidence. The jury returned a verdict in favor of plaintiff against all defendants in the amount of $100,000, and judgment was entered thereon. All defendants subsequently made motions for a new trial or judgment notwithstanding the verdict ("J.N.O.V."), which were also denied.
The defendants present several issues for review. Among these questions is the correctness of the trial court's denial of the defendants' motions for directed verdicts and J.N.O.V. As the following discussion discloses, we disagree with the trial court's resolution of those issues and hold that the defendants' motions for directed verdicts were due to be granted.
This Court is mindful of the scope of its review. We recognize that "[a] strong presumption favors the jury's verdict and the trial court's refusal to grant a new trial."American Furniture Galleries v. McWane, Inc.,477 So.2d 369, 373 (Ala. 1985). This presumption of correctness will not be disturbed unless the weight and preponderance of the evidence, when viewed in a light most favorable to the nonmoving party, is so decided as to convince this Court that the result is palpably wrong and manifestly unjust. Cityof Mobile v. Dirt, Inc., 475 So.2d 503 (Ala. 1985);Coleman v. Steel City Crane Rentals, Inc.,475 So.2d 498 (Ala. 1985); Intestate Engineering, Inc. v.Burnette, 474 So.2d 624 (Ala. 1985).
With that scope of review in mind, we proceed with an individualized treatment of the evidence as it relates to each defendant in this case.
 I. The Claim Against Continental.
Under plaintiff's complaint, the theory of Continental's liability was that Continental negligently failed to perform safety inspections and to advise Clark Construction Company of an unsafe and dangerous condition — that there was no headache ball on the crane and that grease was on the chain of the crane.
According to the evidence, a headache ball is a metal ball of a shape similar to that of a basketball and such balls are manufactured in various sizes. When utilized in construction, it is shackled to the end of a crane cable. The headache ball is not a permanent part of a crane, and, when not in use, it is detached from the cable. The evidence disclosed that Clark Construction Company did not use headache balls for pile driving.
In a recent case, this Court has reiterated the principles governing liability of an insurance company for negligent safety inspection. In Adams v. Travelers Ins. Co.,494 So.2d 401, 403 (Ala. 1986), this Court quoted fromBarnes v. Liberty Mutual Ins. Co., 472 So.2d 1041,1042 (Ala. 1985):
 "Common law liability to third parties can arise from the negligent performance *Page 1314 
of even a voluntary undertaking. Beasley v. MacDonald Engineering Co., 287 Ala. 189, 249 So.2d 844 (1971). Under current Alabama law, a worker's compensation carrier may be liable when it voluntarily undertakes to inspect an employer's premises for safety. Fireman's Fund American Insurance Co. v. Coleman, 394 So.2d 334, 338 (Ala. 1980). However, in a suit of this nature, a plaintiff bears the burden of proving (1) that the defendant had a duty, or assumed a duty by voluntarily undertaking the inspection; (2) the scope of that duty; (3) whether the duty was breached; (4) whether there was damage or injury; and (5) whether the injury was proximately caused by that breach. Fireman's Fund, 394 So.2d at 349 (Jones, J., concurring); see also, United States Fidelity Guaranty Co. v. Jones, 356 So.2d 596 (Ala. 1977)."
In Barnes, we held that proof of a general inspection of the premises by the insurance carrier was insufficient to establish a negligent inspection when that proof did not contain any evidence of an undertaking by the insurance carrier to inspect the specific area of the plant where the injury occurred. Barnes, 472 So.2d at 1042. In Adams, we refused to accept the plaintiff's argument that the insurance company's failure to inspect the plant while it was in operation was, in and of itself, proof of a negligent inspection. Adams, 494 So.2d at 404. Since the inspection had occurred after the plant had shut down for the day, we held that the insurance company had not undertaken a duty to discover any defects in its insured's operation. Id.
The instant case also turns on the question of duty. From an inspection of the record, it is apparent that the question of the extent of Continental's undertaking (i.e., the duty issue) is controlled by this Court's holdings inBarnes and Adams, supra.
In this case, the plaintiff's sole witness offered on the claim of negligent inspection was David Floyd, the brother of the plaintiff. David Floyd testified that an insurance company employee did a field inspection at the Highway 84 jobsite (between Andalusia and Opp) sometime in July 1982 and "looked at the equipment and everything out there," including the crane later involved in his brother's injury. There was no evidence whatsoever that the crane was being used for driving pilings at that time, nor was there any evidence that it did or did not have a headache ball at the time of this purported inspection.
Additionally, there was no evidence introduced through David Floyd, or any other witness, that Continental made a safety inspection of this crane or of the work area at the site in Pickens County where the plaintiff was injured. Furthermore, Continental's records, which the plaintiff introduced, disclosed that the most recent jobsite inspection had been on October 10, 1980, on a bridge construction site at Abbie Creek near Abbeville, Alabama, but this evidence did not establish the occurrence of a pile driving operation at the time of that job site inspection. Indeed, the evidence established that the bridge was two-thirds completed when Continental inspected it.
The plaintiff did introduce a "Loss Control Report" prepared by Continental dated August 5, 1982, but the loss control representative who completed the survey testified that it was merely a "regular complete survey":
 "Q. What, for the jury, is a regular complete survey?
 "A. This is when we would go to the main office of the insured to find out about what his operations were. The extent of his operations as they would pertain to that type of business. For instance, whether he was a bridge contractor, whether it was large bridges, small bridges or whatever.
"Q. Is that an office visit?
"A. That's usually done at the office, yes.
"Q. As requested, did you make an office visit?
"A. I did that.
 "Q. The second request on that form was for a job site survey?
"A. That's correct. *Page 1315 
 "Q. What is a job site survey as compared to an office visit or a regular complete survey?
 "A. That would be when I would go out to the insured's job site and observe to see that their operations were there, the extent of their activity and what their activities or processes were at that time.
 "Q. Could I ask you to review what has already been marked and introduced into evidence as Plaintiff's Exhibits Seven, Eight, and Nine, if you would review them and tell me what they are?
 "A. These are reports that I prepared after my visit to the insured's office.
"Q. Are they office visit reports?
"A. Yes.
"Q. Are they job site reports?
 "A. I did not go to a job site on this particular occasion because there was not a job in progress in the area at the time.
"Q. Did you prepare those reports?
"A. Yes, I did.
 "Q. Were all the reports generated from information you obtained from Mr. Clark in Dozier?
"A. Yes.
"Q. What is the date of those reports?
"A. They are dated August the 5th, 1982.
"Q. August 5, 1982?
"A. Correct.
"Q. Is that the date of your office visit?
"A. Yes.
"Q. Are you sure?
 "A. Yes. The other records will substantiate this also.
". . . .
 "Q. On August the 5th, 1982, did you conduct any job site survey?
"A. I did not.
 "Q. Between August the 5th, 1982, and when Mr. Floyd injured himself on September 7, 1982, did you conduct any job site survey for Clark Construction Company?
"A. I did not.
 "Q. Have you ever conducted a survey or an inspection of this Northwest Crane?
"A. I have not.
"Q. At anytime for Clark Construction Company?
"A. I have not.
 "Q. And all of the reports which have been marked into evidence pertain to your office visits? Is that correct?
 "A. Those reports pertain to my office visit, that's correct."
On cross-examination, the plaintiff further defined the scope of this inspection:
 "A. It was an office visit and I did not see any equipment.
"Q. Did you look for any equipment?
"A. No.
 "Q. You did not bother to look? It was an office visit and did you just talk with Mr. Clark and do nothing else?
 "A. As I recall, his office is in town. Now where he would put some equipment, I would not know.
 "Q. I'm not asking you that now. We have done been into that. I'm asking you now did you do anything in Dozier on August 5th, other than talk to Mr. Clark?
"A. That's it.
"Q. Just a conversation?
"A. That's correct.
"Q. About what?
"A. His operations."
Moreover, there was a complete absence of any evidence establishing that a headache ball should have been used on a crane job for pile driving. To the contrary, the record disclosed undisputed evidence that the use of a headache ball would have interfered with and hindered the pile driving operation.
Thus, in light of our recent decisions in Barnes
and Adams, we find that defendant Continental did not undertake the duty to provide a safety inspection for Clark Construction Company; therefore, there can be no breach on which liability would lie for a negligent safety inspection. *Page 1316 
 II. The Claims Against Co-Employees C.D. Clark, Coby Clark, and Gerald McLeod
The basis of co-employee liability in this state arises from Alabama's statutory duty on the employer to provide a reasonably safe place to work. Code of 1975, § 25-1-1. By definition, the statutory term "employer" includes:
 "every person, firm, corporation, partnership, joint stock association, agent, manager, representative, foreman or other person having control or custody of any employment, place of employment or of any employee, but the terms of this section shall not be construed to cover the employment of agricultural workers or domestic servants."
The imposition of liability on a co-employee, however, it not automatic; it does not arise out of one's job title or even out of the amount of control, in and of itself, which the co-employee exerts at the workplace. Clements v.Webster, 425 So.2d 1058 (Ala. 1982). To impose liability on a defendant co-employee in this state, the plaintiff must bear the burden of proving the elements of a three-prong test for the co-employee defendant. Clements, 425 So.2d at 1060.
First, the plaintiff must show that, as part of the defendant co-employee's responsibilities, he voluntarily assumed or was delegated his employer's duty to provide a safe place to work. Second, the plaintiff must show that the co-employee breached that duty by failing, either through omission or commission, to discharge the delegated or assumed obligation with reasonable care. Third, the plaintiff must show that this breach directly or proximately caused the plaintiff's injury. Kennemer v. McFann,470 So.2d 1113 (Ala. 1985); Welch v. Jones, 470 So.2d 1103
(Ala. 1985); Clements v. Webster, 425 So.2d 1058
(Ala. 1982); Fireman's Fund American Ins. Co. v.Coleman, 394 So.2d 334 (Ala. 1980). In all actions arising out of Code of 1975, § 25-1-1, negligence will lie against the defendant co-employee if, and only if, the plaintiff proves all three elements of the test by at least a scintilla of evidence. To determine whether the plaintiff met this test for co-employee liability, we must review the evidence as it relates to each individual co-employee defendant.
 A. C.D. Clark
The plaintiff alleged that C.D. Clark, president of Clark Construction Company, was responsible for the "works, ways, machinery and safety precautions of said job site." On appeal, the plaintiff argues that C.D. Clark "was responsible for the training and responsible for the equipment."
The record reveals that during the trial, the plaintiff called Clark as an adverse witness and elicited from him the following testimony:
 "Q. As part of your job as president, you were interested in the safety of your employees, weren't you?
"A. Very much so.
 "Q. And you were interested in having the equipment safe?
"A. Right.
 "Q. And you considered that part of your responsibility as president of the corporation?
"A. Right.
"Q. To maintain safety in every way you could?
"A. That's correct."
The question for defendant D.C. Clark is whether this testimony was sufficient, in light of the holdings inKennemer v. McFann, 470 So.2d 1113 (Ala. 1985), andWelch v. Jones, 470 So.2d 1103 (Ala. 1985), to show that Clark had either been delegated or had voluntarily assumed the responsibility for the plaintiff's safety.
In Welch we affirmed a co-employee judgment against James C. Welch, the president of the James C. Welch Construction Company, because the evidence revealed an active participation on his part in the day-to-day field operation of his construction company. This involvement included regular visits at the jobsite at least once and sometimes twice a week. While there, he would undertake to look for unsafe practices and hazards at the workplace. Should he see a condition of which he did not approve, he would immediately *Page 1317 
order it changed. Welch also received all of the jobsite surveys from his insurance carrier and would personally verify that his job superintendent had rectified any of the unsafe practices or conditions that his carrier had noted. Finally, the evidence showed that Welch had last inspected the very area where the accident occurred within two weeks of the fall. Thus, a jury could have reasonably inferred from the evidence that Welch had personal knowledge of the dangerous condition that proximately caused the plaintiff's injury. In light of this evidence, we found that James C. Welch had personally assumed the employer's duty to provide a safe place to work.
On the other hand, we did not find the assumption of the duty by the defendant Charles Partain in Kennemer v.McFann. Partain had the general administrative responsibility for a company-wide safety program that included the formulation and distribution of safety procedures and regulations to the various field operations of his company. One of the written procedures required that all rubber-tired vehicles have brakes in good service.
The evidence showed that the truck that caused the plaintiff's injury was maintained in violation of these written procedures and that the lack of adequate brakes proximately contributed to the accident in question. There was no evidence, however, that Partain had any first-hand knowledge of the poor maintenance of the vehicle.
We reversed the judgment against Partain because we found that his job title alone did not impose upon him the individualized duty to verify the compliance of each piece of the company's equipment with the established written procedures. Partain's general administrative responsibilities were too remote in regard to the defective instrumentality that caused the plaintiff's injuries for co-employee liability to be imposed upon him.
The evidence of record in the instant case reveals that C.D. Clark's involvement in his company is more closely akin to Partain's administrative responsibilities than to Welch's voluntary assumption of the employer's duty to provide a safe place to work. Although he was the president of his construction company, the evidence here does not show any visits by Clark to the Pickens County jobsite before the plaintiff was injured. There is no indication that Clark was personally involved in the training of the employees at the jobsites, nor is there any evidence showing his presence at, or supervision of, a pile driving operation at any jobsite. Finally, the record is devoid of any evidence revealing any personal knowledge by Clark of the plaintiff's having ridden the cable to the ground at the Tuscaloosa jobsite. Rather, the evidence indicated that C.D. Clark only supervised the operation from his company's corporate offices in Dozier, Alabama.
We can find no evidence of any actions by C.D. Clark that would substantiate the claim that he had assumed a personal duty to provide for the plaintiff's safety; the record shows only the assumption of a generalized administrative responsibility. We have repeatedly held that "[a] co-employee cannot be held liable merely because he has a general administrative responsibility; the fact that a person is in an administrative or supervisory position alone does not make that person liable." Clements v. Webster, 425 So.2d at 1060. Therefore, as it relates to C.D. Clark, we find that the evidence was insufficient to sustain a judgment against him. C.D. Clark was entitled to a directed verdict at the close of the evidence, and not getting this, to a J.N.O.V.
 B. Gerald McLeod
The plaintiff also sued Gerald McLeod, his job superintendent at the Pickens County jobsite.
The plaintiff did not call McLeod as an adverse witness in his case in chief. He did secure testimony from another co-defendant, Coby Clark, that McLeod was "in charge" of the Pickens County jobsite. The plaintiff did cross-examine McLeod; however, we cannot find a scintilla of evidence that McLeod either had been delegated or had voluntarily assumed the employer's statutory duty, § 25-1-1. The testimony that McLeod was "in charge" is insufficient, because "[l]iability of a co-employee *Page 1318 
must be predicated upon the breach of a personal duty owed to the injured employee and not upon general administrative responsibilities." Fireman's Fund American Ins. Co. v.Coleman, 394 So.2d 334, 347 (Ala. 1980) (Jones, J., concurring in the result). We hold that the plaintiff did not sustain his burden of establishing a duty on the part of McLeod; therefore, the trial court should have granted his J.N.O.V. as well.
 C. Coby Clark
The thrust of the plaintiff's action against Coby Clark differs in scope from the plaintiff's cases against the other two co-employee defendants, C.D. Clark and Gerald McLeod. The cases against the latter two dealt with their alleged breach of the employer's duty to provide a safe place to work. Accordingly, the question of their liability turned on whether in his case in chief, the plaintiff had proved the delegation to, or the voluntary assumption by, either of them, of any of the employer's common law or statutory duties, and if so, whether the evidence showed for either a breach of duty that proximately resulted in the plaintiff's injury. For C.D. Clark and Gerald McLeod, the determination as to liability fell squarely within the holdings ofFireman's Fund American Ins. Co. v. Coleman, supra, and its progeny.
The plaintiff argues, however, that Fireman's Fund
and the other co-employee cases have no bearing on his action against Coby Clark due to the fact that the plaintiff's action did not allege Clark's breach of any of the employer's duties at law. Rather, the plaintiff insists that Coby Clark breached another duty, one personal in nature and derived from the common law, that required every worker to exercise reasonable care in the conduct of his or her job responsibilities so as not to injure another. The plaintiff contends that Coby Clark breached this common law duty to the plaintiff by negligent operation of the crane at the jobsite in Pickens County. Thus, the plaintiff argues that he only had to prove simple negligence against this defendant.
We do not dispute the plaintiff's contention that one fellow employee can be liable to another fellow employee for his negligence proximately causing the injury to the latter. This is precisely the rule of law in Wright v.McCord, 205 Ala. 122, 88 So. 150 (1920), which addressed the identical duty raised by the plaintiff here.
In Wright, an injured employee brought an action of negligence, jointly and severally, against his employer, J.S. Walker, under the Employer's Liability Act, and against his fellow employee, H.C. McCord. The trial court sustained the demurrer to the allegations of the complaint against the employer, and this Court affirmed that action on appeal. This Court, however, reversed the trial court's sustaining of fellow employee McCord's demurrer to the allegation of the complaint, because the plaintiff's allegations of McCord's breach of his common law duty to the plaintiff stated a viable cause of action.
In discussing this duty, the Court wrote:
 "It is not his contract with the master that exposes the agent to liability to such third persons; it is the liability of the servant independent of that of the master, by reason of the servant's common-law obligation to so use that which he controls as not to injure another. The mere relation of agency does not exempt a person from liability for an injury to a third person proximately resulting from the neglect of duty of such agent for which he would otherwise be liable."
Wright, 205 Ala. at 126, 88 So. at 153. In light of this duty, the Court concluded that an employee, once he had undertaken the discharge of his job responsibilities, was thus duty-bound to use reasonable care in the manner in which he executed his work so as not to cause injury to another person. Id.
The holding in Wright also agrees with the general rule of law that "[a]s between themselves, servants mutually owe to each other the duty of exercising ordinary care in the performance of their service, and whoever fails in that respect is liable for any injury resulting therefrom to his fellow servant." 5 Thompson, Commentaries on *Page 1319 the Law of Negligence § 5777 (2d ed. 1905); see also, Woods, Law of Master and Servant § 325(a) (2d ed. 1886) ("it may be said to be well established that one servant may maintain an action against a co-servant for injuries sustained by reason of [the] other's negligence"); 2 Sherman Redfield, A Treatise on the Law ofNegligence § 245 (6th ed. 1913) ("The authorities are now unanimous in favor of holding a servant liable to his fellow servants for injuries suffered by them through his personal negligence in the performance of those duties which each man owes to his fellow men"); accord, 57 C.J.S.Master and Servant § 578 (1948); 53 Am.Jur.2dMaster and Servant §§ 398-99 (1970).
In fact, our research has failed to reveal a case from any jurisdiction that has reached a contrary holding. So clearly established was this general rule that the Mississippi Supreme Court wrote:
 "There is nothing to any rule of law which acquits one fellow servant of liability to another fellow servant when the accident in question was primarily and proximately caused by the negligence of such fellow servant."
Greer v. Pierce, 167 Miss. 65, 147 So. 303, 304
(1933).
The negligent employee does not enjoy any of the special common law rules that protected the employer from actions by an injured employee. The doctrine that a servant cannot recover for the negligence of a co-employee only precludes actions by the injured employee against hisemployer. 5 Thompson, supra, at 247. Falling in the same category are the common employment and fellow servant defenses, Lovell v. DeBardelaben Coal Iron Co., 90 Ala. 13, 7 So. 756 (1890); Louisville Nashville R.R. v. Allen's Adm'r, 78 Ala. 494 (1885), the duty of the employee to avoid his own injury, BessemerLand Improvement Co. v. Campbell, 121 Ala. 50,25 So. 793 (1899), and the doctrine of the employee's assuming the risk of an injury from a fellow employee. Boggs v.Alabama Consolidated Coal Iron Co., 167 Ala. 251,52 So. 878 (1910). None of these defenses or rules protects the negligent employee from any action brought by an injured fellow worker who alleges a breach of the employee's duty at common law.
Nor is Wright v. McCord the only Alabama case that recognizes this common law duty. Rather, it is one of a line of cases that establish a duty on the employee, not just to fellow workers but, as well, to any person, Carter v.Franklin, 234 Ala. 116, 173 So. 861 (1937); Mayer v.Thompson-Hutchinson Bldg. Co., 104 Ala. 611, 16 So. 620
(1894), or any property, Sloss-Sheffield Steel Iron Co.v. Wilkes, 231 Ala. 511, 165 So. 764 (1936), overruled on other grounds by Henderson v. Wade Sand GravelCo., 388 So.2d 900 (1980); Hilburn v. McKinney,204 Ala. 158, 85 So. 496 (1920), that is injured or damaged as a result of the employee's failure to use reasonable care in the discharge of his job responsibilities.
Therefore, we hold that the plaintiff stated a valid cause of action when he alleged that Coby Clark had breached this common law duty emanating from one fellow servant to another. This duty arose, not only because of Clark's relationship as a fellow worker of the plaintiff, but also because Coby Clark had complete control of the operation of the crane. Coby Clark was thus duty-bound to exercise reasonable care in his job responsibilities regarding the operation of the crane so as not to negligently injure Floyd.
However, there remains the question, to which we now turn, of whether the plaintiff presented at least a scintilla of evidence of a breach of this common law duty by Coby Clark in his operation of the crane in Pickens County.
Wright and its line of cases hold that whether the breach of this duty resulted from actions of omission or of commission is unimportant. Mayer v. Thompson, supra.
Consequently, a defendant's liability for his "negligent performance may result from [his] omitting to do what ought to be done as well as [from] performing his duties in an improper manner." Sloss-Sheffield Steel Iron Co. v.Wilkins, 231 Ala. at 514-15, 165 So. at 766. "But he must be a wrongdoer in such sort that *Page 1320 
under the particular facts of the case his negligence or wrongful act was a proximate cause of an injury." Carterv. Franklin, 234 Ala. at 119, 173 So. at 863.
When the plaintiff stepped off the leads, while holding onto a loop in the cable, he expected the cable to be taut and to suspend him in mid-air until the crane operator could lower him to the ground by the slow release of the cable line. He testified that that was what had happened in the 15 to 20 times that he had previously ridden the cable to the ground with another crane operator at the Tuscaloosa jobsite.
On this particular instance, however, the line was not taut because Coby Clark had created slack in the line, purportedly to facilitate the plaintiff's task of disconnecting the cable from the piling. Coby Clark also testified that he had applied a brake on the line after he had released the slack. In any event, at the Pickens County site, when he stepped off the piling, Floyd immediately dropped the distance of the slack (approximately 4 feet), at which time the line jerked. With this jerk, the plaintiff lost his grip on the cable and fell 30 feet to the ground, resulting in his injuries.
The parties agree that either the presence of slack in the cable or the application of the brake on the line, or a combination of both, occasioned the plaintiff's fall. Nevertheless, these facts, without more, do not evidence Coby Clark's negligent operation of the crane.
The evidence reveals that the normal operation of a leads man includes his manually pulling the cable downward with one hand while holding onto the leads ladder with his other hand. Indeed, this is the very procedure utilized by Willie Taylor and Floyd on the first two piling operations with Coby Clark at the Pickens County jobsite. Thus, under the normal operating procedure of pulling the cable downward, neither the presence of the slack nor the application of the brake would have a bearing on the question of a breach of Clark's common law duty to Floyd by the manner in which he operated the crane that proximately caused Floyd's injuries.
We do not have an instance here of the plaintiff's losing his grip on the leads ladder and falling to the ground due to Clark's actions in allowing slack in the cable and/or his applying a brake on it; nor do we have an instance here in which the plaintiff was injured while descending from the leads according to the standard operating procedure for a leads man. Rather, the evidence clearly establishes that the plaintiff fell while attempting a procedure different from the norm, i.e., instead of climbing down the ladder after he had disconnected the cable, Floyd stepped off the leads, while holding onto the cable, and relied on the crane operator to lower him to the ground.
Under these circumstances, the fact that plaintiff Floyd expected the line to be taut and that he expected to be safely lowered to the ground by this defendant is immaterial to the question of Coby Clark's negligent breach of his common law duty.
The common law duty requires that Coby Clark use reasonable care in the performance of his job responsibilities as they relate to the operation of the crane. It does not require that Clark anticipate and provide for a contingency, such as we have here, that was not part of his normal job responsibilities, especially in light of the facts that the plaintiff fell on his first attempt to "ride the cable" withthis crane operator and that he failed to present any evidence that would place Coby Clark at the Tuscaloosa jobsite at any of the times when the plaintiff had engaged in this practice. The plaintiff further admitted that he had never seen another employee of Clark Construction Company ride the cable to the ground and that, to the best of his knowledge, he was the only one in the company who descended from the top of the leads in that manner. On these facts, the plaintiff cannot contend that lowering him from the leads by the crane cable was part of Clark's job responsibilities as a crane operator. Indeed, the record is void of any evidence establishing that this task was part of Clark's duties as a crane operator.
The issue of common law liability for negligent performance of a duty that was *Page 1321 
not part of the employee's job responsibilities was addressed in three of the common law-duty cases previously cited. InSloss-Sheffield Steel Iron Co. v. Wilkes, supra, the Court stated that the defendant "was certainly not personally responsible to plaintiff for failing to do something not within the scope of his duties."231 Ala. at 520, 165 So. at 772. The same result was reached inCarter v. Franklin, supra, and Hilburn v.McKinney, supra.
Therefore, we hold that the plaintiff failed to prove a breach of Coby Clark's common law duty to Floyd, because the task of transporting him from the leads by means of the crane cable was not part of Clark's normal job responsibilities as a crane operator. Absent a duty, the verdict against Coby Clark, grounded in negligence, cannot be sustained. As our sister court wrote:
 "But it must be borne in mind that this rule of liability always rests upon the question of the duty of the agent toward the injured party and his negligent disregard or violation of that duty, and that where no duty arises there can be no liability."
Mississippi Power Light Co. v. Smith, 169 Miss. 447,153 So. 376, 379 (1934).
The plaintiff contends that he established by his testimony, albeit disputed by Coby Clark, that Clark had actual notice of the plaintiff's intent to ride the cable down from the top of the leads. This testimony, however, does not establish that there was a breach of Clark's common law duty, because, as outlined above, Clark had no duty to assist the plaintiff in his endeavor to ride the cable down to the ground. Having concluded that the plaintiff did not prove a breach of duty owed by Coby Clark to this plaintiff, whether common law or otherwise, we hold that the trial court should have granted Coby Clark's motion for a directed verdict, or in the alternative, a J.N.O.V.
Since we have reversed the judgment against all of the defendants, we need not address the remaining issues raised on this appeal.
For the foregoing reasons, the judgments against Continental, C.D. Clark, Gerald McLeod, and Coby Clark, are due to be, and they are hereby, reversed, and the cause is remanded.
REVERSED AND REMANDED.
MADDOX, ALMON, SHORES and HOUSTON, JJ., concur.
ADAMS and STEAGALL, JJ., concur in the result.
TORBERT, C.J., and JONES, J., not sitting.