This is an appeal from a JNOV for certain defendants and an order granting a new trial for the other defendant in this action against co-employees. Willie Frank Stallworth filed suit in Mobile County against R.W. Richardson, Billy G. Holt, Orland C. Harp, and David Lowell Gray, all of whom were co-employees of Stallworth. The case was transferred to Escambia County. Richardson had not been served *Page 1065 
prior to trial, and the claim against him was severed from the remaining claims. The present case was tried before a jury, which rendered a verdict in favor of Stallworth against Harp, Holt, and Gray in the amount of $500,000. Following post-trial motions, the court granted judgment notwithstanding the verdict, in favor of Harp and Holt and a new trial in favor of Gray. Stallworth appeals from the judgment of the trial court.
Stallworth worked in the "caustic area" of Container Corporation of America's Brewton mill. The caustic area of the mill is the site of a chemical process whereby wood chips are cooked in a highly caustic substance in the early phases of the paper making process. A chemical dust that is a by-product of the process mixes with moisture in the air and settles, caking onto surfaces in the area. This substance corrodes metal onto which it accumulates. On November 30, 1983, Stallworth, in performance of his duties, was walking on an elevated catwalk that had been weakened by this corrosive substance. The catwalk collapsed underneath him. Stallworth was able to grab the handrails and prevent himself from falling, but his back was injured in the process.
Harp was safety coordinator at the Brewton mill for six or seven years directly preceding Stallworth's injury. At the time of the accident, Harp was being phased out as safety coordinator, and Gray was being phased in at that position. Holt was the assistant pulp mill superintendent.
The trial court stated in its order granting JNOV in favor of Harp and Holt that Stallworth had failed to show that either Harp or Holt had been delegated or had assumed a personal duty to provide Stallworth with a reasonably safe place to work.
This Court addressed the issue of co-employee liability inClark v. Floyd, 514 So.2d 1309 (Ala. 1987):
 "The imposition of liability on a co-employee, however, is not automatic; it does not arise out of one's job title or even out of the amount of control, in and of itself, which the co-employee exerts at the workplace. Clements v. Webster, 425 So.2d 1058 (Ala. 1982). To impose liability on a defendant co-employee in this state, the plaintiff must bear the burden of proving the elements of a three-prong test for the co-employee defendant. Clements, 425 So.2d at 1060.
 "First, the plaintiff must show that, as part of the defendant co-employee's responsibilities, he voluntarily assumed or was delegated his employer's duty to provide a safe place to work. Second, the plaintiff must show that the co-employee breached that duty by failing, either through omission or commission, to discharge the delegated or assumed obligation with reasonable care. Third, the plaintiff must show that this breach directly or proximately caused the plaintiff's injury. Kennemer v. McFann, 470 So.2d 1113 (Ala. 1985); Welch v. Jones, 470 So.2d 1103 (Ala. 1985); Clements v. Webster, 425 So.2d 1058
(Ala. 1982); Fireman's Fund American Ins. Co. v. Coleman, 394 So.2d 334 (Ala. 1980). In all actions arising out of Code of 1975, § 25-1-1, negligence will lie against the defendant co-employee if, and only if, the plaintiff proves all three elements of the test by at least a scintilla of evidence."
514 So.2d at 1316.
This Court has indicated that sufficient evidence of a duty to provide a reasonably safe place of employment includes such factors as frequent visits to the work site and direct dealings with the workmen or direct work on safety or on the defect which caused the injury. Hall v. Harris,504 So.2d 271 (Ala. 1987); Welch v. Jones,470 So.2d 1103 (Ala. 1985).
Harp was called by Stallworth as an adverse witness and testified that in his capacity as safety coordinator he would tour the mill and make oral reports to the line managers if there were problem areas.
During Stallworth's examination of Harp, the following exchanges took place:
 "Q Mr. Harp, on some of these tours you would make of the caustic area of the plant and, specifically, looking at the catwalks before Mr. Stallworth's injury, *Page 1066 
on occasions you would note some of the catwalks needing some repairs and being in a state of disrepair, would you not? "A I think it would be a matter of degree. It is possible that I did note it. Possible that I did not.
 "Q Seventeen, 9. Let's take a look at this question we asked you at your deposition, page 17. 'In your walk-through inspection of the caustic area, did you ever see any of the catwalks or metal structures or gratings that were beginning to look deteriorated to you?' And your answer was, 'Yes.'
"A Uh-huh.
 "Q 'Were these things you ended up putting in work orders for or requested some kind of testing on?' And your answer was, 'No.' The question: 'Why not?' 'The question was beginning to look. And at that point I didn't feel like it was necessary.' Is that correct?
"A That is correct.
 "Q What you are saying is you would note the condition of the catwalks as being in a state of disrepair and you would simply decide whether it was something needed replacing, repairing or getting that way and let's keep an eye on it?
"A That is correct."
". . .
 "Q What would you use as your determining factor in deciding when something was just kind of looking bad and when it was to the point it needed some repair?
"A Simply observation.
 "Q And I am not sure what you mean by that. You said there was no testing that was done to check it; right?
 "A Well, if a grating, for instance, had worn through to the point that it appeared to be unsafe to me, then I would report it to the department superintendent in most cases and he would follow up with a work request to maintenance to repair it.
 "Q What you are saying is if by looking at it you thought it was bad shape or posed a risk of harm to others you would report it?
"A That is correct."
This testimony is evidence from which a jury could have determined that, while Harp may not have been delegated a duty to inspect the catwalks for defects, he had assumed a duty to do so. All that is necessary to avoid a directed verdict, and therefore a JNOV, is a scintilla of evidence.Gary v. Kirkland, 514 So.2d 970 (Ala. 1987).
This Court has held that a co-employee cannot be held liable merely because of his general superintendence of the overall safety program of his employer. Kennemer v.McFann, 470 So.2d 1113 (Ala. 1985). See alsoFireman's Fund American Ins. Co. v. Coleman,394 So.2d 334 (Ala. 1980) (Jones, J., concurring in the result).
When Harp inspected the catwalks and made decisions as to whether they should be repaired, the results of his decisions impacted directly on the workers in the caustic area of the mill. This conduct went beyond a general superintendence of the overall safety program and imposed on Harp a personal duty to the workers directly affected by his decisions.
Holt was also called by Stallworth as an adverse witness. Holt testified that in his capacity as assistant pulp mill superintendent he had responsibilities and duties for the safety of the employees below him in Container Corporation's hierarchy.
During Holt's testimony, the following exchanges took place:
 "Q Now, let's look up for a moment to the time when you were a tour foreman. You testified in your deposition, I believe, that you would make periodic inspection of the catwalk area; is that correct?
"A That is correct.
 "Q And those were part of your responsibility; isn't that correct?
"A Yes.
 "Q And you would look for dangerous areas on the catwalk?
"A Yeah.
 "Q You had that same responsibility the day that Mr. Stallworth got hurt in *Page 1067 
your capacity as Assistant Superintendent, did you not, sir?
"A Yes."
". . .
 "Q And you and Mr. Gray had the duty and the responsibility to insure the best you could that those catwalks 20, 35 feet in the area [sic] were in the best condition at the time and prior to the time Mr. Stallworth was hurt; isn't that correct?
 "A We were supposed to keep them safe to the best of our ability.
 "Q And it would be a breach of your duties and responsibilities and a breach in the duties and responsibilities of Mr. Gray if you didn't keep them safe; isn't that correct?
"A If we knew about it, right.
 "Q And, if you let them deteriorate, you and Mr. Gray let that caustic area and the caustic materials rot those metal catwalks without comprehensive repairs, it would be a breach of your responsibilities and duties for safety; isn't that correct?
"A If we let that happen, yes."
". . .
 "Q Now, you mentioned that you did make inspections to keep the catwalks as safe as you could?
"A Yes, that is correct.
 "Q And did I understand you to say that was regular?
"A Yes, sir.
"Q Regular inspections?
"A Yes, sir."
". . .
 "Q But you in your capacity as a supervisor could look at an area and tell it was generally dangerous and someone could most probably get hurt there, couldn't you? Wasn't that one of your duties?
"A That's correct."
 "Q So without getting into Mr. Stallworth's exact spot of injury, you certainly had the capabilities, the mental capabilities, and the responsibilities to examine catwalks and determine whether or not it was generally in good repair or not in good repair; isn't that correct?
"A That's correct."
In addition to Holt's own testimony, Stallworth presented the deposition testimony of Gus Vidana, who was also an assistant pulp mill superintendent at the time of Stallworth's injury. Vidana testified as follows:
 "Q Let's see if I've got the process straight. Let's use a hypothetical. If a tour foreman or an operator sees a condition, they would initiate a work order request —
"A Okay.
 "Q — and the routing of that would be to either yourself or Mr. Holt, then to Mr. Richardson and then a copy to Dave Gray?
 "A A copy went to the safety coordinator. The original went then to the maintenance group that would set up the schedule maintenance for it. We would assign priority times.
"Q Who would?
"A We would at the pulp mill.
 "Q Can you tell me specifically which — was there a particular person or a job title that decided the priorities?
"A The assistants, Billy Holt and myself.
 "Q Was there a breakdown between the responsibilities of yourself and Mr. Holt?
 "A Yes and no. When Billy Holt was there, he would handle personnel, and he would handle also the work orders. That is to avoid confusion and overlapping with the maintenance group. I would handle mostly the process in the mill itself, the operations.
 "Q So the work orders would be more likely routed through Mr. Holt than yourself?
"A Correct."
This testimony could lead a jury to the inference that Holt owed a duty to the workers in the caustic area to provide them with a safe place to work. Like Harp's, Holt's duty goes beyond a general superintendence of the overall safety program and is a personal duty owed to the workers directly affected by Holt's actions.
Because there is evidence from which a jury properly could determine that Harp *Page 1068 
and Holt owed Stallworth a duty to provide a safe workplace, the trial court erred in granting JNOV for Harp and Holt.
Stallworth also argues that the trial court erred in granting a new trial on the claim against Gray. After giving its reasons for denying a JNOV for Gray, the court continued:
 "Notwithstanding, the Court is of the further opinion that the motion for a new trial should be granted as to the Defendant Gray, for reasons hereinafter set forth. One of the grounds set forth in the motion for new trial is that the verdict and judgment of the jury was the product of improper argument of the Plaintiff's counsel who injected the purported wealth of the Defendants in an effort to encourage the jury to award damages based upon elements not proper to be considered in fixing damages. The Court believes this has merit. During closing argument, Plaintiff's counsel stated the following: 'The safety man, who is paid an excellent salary, a safety director. Possibly two of them were; one was superintendent, I am sure, making more —' Counsel for the Defendants promptly objected by stating 'we are going to object to him injecting wealth or poverty into —,' at which time Plaintiff's counsel stated 'I withdraw that.' The only response from the Court was 'just stay with the evidence.' On the authority of Allison v. Acton-Etheridge Coal Co., 289 Ala. 443, 268 So.2d 725 (1972), and Estis Trucking Co. v. Hammond, 387 So.2d 768 (Ala. 1980), and cases cited therein, this Court is of the opinion that all three Defendants would be entitled to a new trial because of argument of counsel which the Court considers to have been prejudicial to the Defendants. There can be no doubt in this Court's mind that the argument referred to [concerned matters] outside the evidence, [was] thus improper, and may have unlawfully influenced the jury. As the Supreme Court stated in the Estis Trucking Company case, the test is not that the argument did unlawfully influence the jury, but whether it might have done so. This Court certainly cannot say that such argument may not have improperly influenced the jury in reaching its verdict for the Plaintiff. Considering the evidence in this case, it is the opinion of the Court that the size of the verdict alone may well be an indication that the jury was prejudiced or otherwise improperly influenced by such argument. Although counsel for the Defendant did not request the Court to give the jury a curative instruction at that particular time, it appears from the cases cited above that the Court was bound to give such an instruction even though such was not requested. The trial transcript further reveals that after the Court had charged the jury, counsel for the Defendants made a motion for a mistrial based on improper argument. When the Court indicated that it was not inclined to grant a mistrial, counsel for the Defendants then requested a curative instruction, and the Court declined to grant that request. The court is of the opinion that at least a curative instruction should have been given, and perhaps an outright mistrial should have been declared. According to the cases previously cited, a curative instruction probably would have been insufficient to rectify the matter."
Stallworth argues that the trial court applied the wrong standard in reaching this decision. This Court has held that the standard of review in Alabama regarding the propriety of an attorney's closing argument is as follows:
 "In a case of improper argument where the trial judge overrules objection and fails to instruct the jury as to the impropriety with direction to disregard, the test upon appeal is not that the argument did unlawfully influence the jury, but whether it might have done so. Williams v. City of Anniston, 257 Ala. 191, 58 So.2d 115
[1952].
 "In a case where objection to improper argument is made and sustained, with immediate and strong action by the trial court instructing the jury that such argument was not correct and admonishing them not to consider it, the test on motion for new trial and on appeal *Page 1069 
is whether the argument was so harmful and prejudicial that its influence was not or could not be eradicated by the action of the court. McLemore v. International Union, etc., 264 Ala. 538, 88 So.2d 170 [1956]."
Otis Elevator Co. v. Stallworth, 474 So.2d 82, 84
(Ala. 1985), quoting Estis Trucking Co. v. Hammond,387 So.2d 768, 771-72 (Ala. 1980) (emphasis inEstis).
We have, in effect, two separate standards. The first standard is to be used in cases where the trial court does not order the jury to disregard the statement and the second is to be used when the trial court does instruct the jury accordingly.
In the present case, the trial court applied the first standard in reaching its decision to order a new trial for Gray. Stallworth argues that the court erred in using this standard.
A review of the record reveals that an objection was made immediately after Stallworth's attorney made the remark that is in issue, and the court sustained the objection. The record also shows that no instruction was given to the jury at that time or at any time thereafter concerning the remark made by Stallworth's attorney. Based on a review of the record, we find that the trial court did not commit reversible error in applying the first standard in reaching its decision to order a new trial.
Stallworth argues that the remarks made by counsel constitute a reply in kind and therefore were not improper.
"Arguments which are replies in kind or are provoked by arguments of opposing counsel do not amount to reversible error." Osborne Truck Lines, Inc. v. Langston,454 So.2d 1317, 1322 (Ala. 1984).
During closing arguments, counsel for Harp, Holt, and Gray argued that Stallworth was suing the wrong defendants. Stallworth asserts that his attorney's statements were made in reply to that argument. At no time did counsel for Harp, Holt, and Gray state that they were not paid by Container to do a specific job. The statement by Stallworth's counsel goes beyond a reply to statements made by counsel for Harp, Holt, and Gray.
Stallworth also contends that the remarks made by counsel were not improper. The trial court held that the remarks improperly injected the wealth of the defendants into the case. Stallworth argues that the trial court erred in reaching this decision.
The question to be answered is whether the remarks made by Stallworth's counsel might have unlawfully influenced the jury. Otis Elevator, supra. The trial court held that the remarks may have done so. After carefully listening to the tape of the closing argument, this Court cannot say that the trial court erred in holding that the remarks were improper.
The final issue on appeal is raised by Harp and Holt. Harp and Holt argue that in the event that the JNOV in their favor is reversed, they are also entitled to a new trial due to the improper argument of Stallworth's counsel. Stallworth asserts that the trial court did not grant a conditional new trial as to Harp and Holt and as a result, upon reversal of the JNOV in their favor, the verdict of the jury should be reinstated.
This Court has held that:
 "Where the trial court granted the motion for judgment n.o.v., but failed to rule on the motion for new trial, and the appellate court reverses the entry of judgment n.o.v., the appellate court may then: (1) order entry of judgment on the verdict; (2) order a new trial; or (3) remand the case to the trial court for reconsideration of the motion for new trial."
Luker v. City of Brantley, 520 So.2d 517, 522 (Ala. 1987), quoting 5A J. Moore J. Lucas, Moore's FederalPractice § 50.14 (2d ed. 1986).
Although the court did not specifically order a new trial for Harp and Holt in the event that its JNOV for them was overturned, it clearly indicated that "all three Defendants would be entitled to a new trial because of argument of counsel." We agree that the prejudicial effect of the closing *Page 1070 
argument worked as much against Harp and Holt as it did against Gray. Because we affirm the granting of a new trial in favor of Gray, we conclude that Harp and Holt are similarly entitled to a new trial.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
JONES, SHORES, ADAMS, HOUSTON and STEAGALL, JJ., concur.