638 So.2d 804 (1994)
John H. CAMPBELL, M.D.
v.
Sharlisia Suttle WILLIAMS.
1920826.
Supreme Court of Alabama.
February 18, 1994.
Rehearing Denied April 8, 1994.
*806 Michael A. Florie, Walter W. Bates, Joseph S. Miller and Scott M. Salter of Starnes & Atchison, Birmingham, for appellant.
Andrew T. Citrin, Michael A. Worel, John T. Crowder, Jr. and David G. Wirtes, Jr. of Cunningham, Bounds, Yance, Crowder and Brown, Mobile, for appellee.
SHORES, Justice.
The defendant doctor appeals from a judgment for the plaintiff entered on a jury verdict in a medical malpractice case seeking damages for the wrongful death of the plaintiff's intestate. The trial court made the following factual findings in its order denying post-judgment relief:
"This case resulted from the death of Plaintiff's deceased, Ms. Willie Mae Sumpter. On March 9, 1987, while Ms. Sumpter was employed at Gulf States Steel in Gadsden, she suffered second and third degree burns about her face. Molten steel had spewed forth from an ingot mold and struck Ms. Sumpter. She was brought to the emergency room of the Holy Name of Jesus Hospital in Gadsden, where she was examined by an emergency room physician who reported her condition to the Defendant Dr. John H. Campbell. Dr. Campbell admitted her to the hospital as his patient. Dr. Campbell treated Ms. Sumpter for her burns and monitored her condition. Within a few hours of her admission, Ms. Sumpter's face had become swollen to the point where her eyes were swollen shut and the inside of her mouth was not accessible to examination. Ms. Sumpter was not intubated or examined by use of a fiber-optic bronchoscope.
"In the early morning of March 10, 1987, Ms. Sumpter began experiencing respiratory distress and suffered respiratory failure due to the closing off of her airway. Following unsuccessful attempts by technicians to regain her airway by intubation, Dr. Campbell, who had been called by the attending nurse, arrived and performed an emergency tracheostomy which restored Ms. Sumpter's airway. However, Ms. Sumpter's respiratory failure resulted in her lapsing into a coma from which she never recovered. Ms. Sumpter died on April 15, 1987.
"The plaintiff's negligence claim against Dr. Campbell involved his failure to transfer Ms. Sumpter to the burn unit at U.A.B. [the hospital of the University of Alabama at Birmingham]; a course of action required by the Holy Name of Jesus Hospital's protocol for the treatment of major burns patients. The plaintiff's additional claim involved Dr. Campbell's failure to protect Ms. Sumpter's airway by intubation or to examine her upper airway by use of a fiber-optic bronchoscope. The Plaintiff further alleged at trial that Dr. Campbell attempted to conceal certain aspects of Ms. Sumpter's condition by requesting another physician to change that physician's notes and also by preparing a summary which detailed events which did not exist.
"Testimony at trial indicated that Dr. Campbell had another physician, Dr. Richard Gallo, change Dr. Gallo's records from a notation that Ms. Sumpter's respiratory failure occurred following a gradual closing of her airway, to a notation which indicated that her respiratory failure occurred suddenly. Dr. Campbell's summary of Ms. Sumpter's treatment included the notation that Ms. Sumpter had experienced a sudden coughing spell just before her respiratory failure and that he felt that she suffered airway blockage due to the presence of a mucous plug. The nurse who was with Ms. Sumpter when she began to experience respiratory distress, testified that there was no coughing spell.
"Upon Ms. Sumpter's respiratory distress, described as `crowing' or fighting for breath, the attending nurse, Carol Fragnoli, contacted Dr. Campbell by telephone and Dr. Campbell ordered an immediate intubation. Attempts at intubation failed due to Ms. Sumpter's swelling and when this was reported to Dr. Campbell, he ordered nurse Fragnoli to send out an emergency code for any physician in the hospital to come and perform an emergency tracheostomy. In response to the emergency code, nurse Fragnoli testified that Dr. [Wilfredo Grana] came from the hospital's emergency room and was advised of *807 Dr. Campbell's order for a tracheostomy, whereupon, according to nurse Fragnoli, Dr. Grana stated that he was not capable of performing a tracheostomy. Dr. Campbell, who had been en route to the hospital as soon as he was contacted, then entered Ms. Sumpter's room and performed the tracheostomy. Dr. Grana was added as a Defendant based upon his alleged involvement.
"Dr. Campbell denied any negligence in his treatment of Ms. Sumpter. Specifically, Dr. Campbell testified that based upon the emergency room examination as reported to him, there was no need to transfer Ms. Sumpter to U.A.B. He further testified that he had successfully treated many burn patients locally and had in this case followed the course of treatment called for under the circumstances. Dr. Campbell testified that nothing about Ms. Sumpter's condition mandated intubation or merited the risks inherent with intubation or fiber-optic bronchoscopy. Dr. Campbell's testimony presented several factors which indicated that Ms. Sumpter's airway was not closing off before her sudden respiratory failure. Dr. Campbell's position was fully supported by the expert testimony of Dr. William Wood, who, himself, had trained and worked at the U.A.B. burn unit.
"Dr. Campbell's course of treatment was attacked by burn experts, Dr. Robert Demling and Dr. Alan Dimick, head of the U.A.B. burn unit.
"Dr. Grana's testimony was that he did not refuse to perform a tracheostomy and that, indeed, he was not even present on the occasion of Ms. Sumpter's respiratory failure.
"Following all of the testimony in the case and while the Jury was deliberating, Counsel for Dr. Campbell advised the Court on the record and in the presence of all parties, that they had reason to believe that the Plaintiff and Defendant Holy Name of Jesus Hospital had entered into a pro tanto settlement and requested that the Court order those Defendants to reveal such settlement and make its terms known to the Jury. The Court noted that no pro tanto settlement had been presented to the Court and thus refused to order the Plaintiff and Defendant Hospital to reveal any agreement they might have reached.
"The Jury returned a verdict in favor of Dr. Grana but found against the hospital and Dr. Campbell and assessed damages in the amount of $4,000,000.00."
Indeed, while the jury was deliberating, and just moments before it returned its verdict, Ms. Williams and Holy Name of Jesus Hospital ("Hospital") entered into a pro tanto settlement under which the hospital agreed to pay $1 million in settlement of the claim against it. Giving credit for the $1 million that the hospital had agreed to pay, the trial court entered a $3 million judgment against Dr. Campbell, based on the jury verdict. After the trial court denied his post-judgment motions, Dr. Campbell brought this appeal. We affirm.
Nine issues are raised on appeal: (1) Whether the Alabama Wrongful Death Statute, § 6-5-410, Code of Ala.1975, is unconstitutional as applied in cases involving multiple defendants. (2) Whether the failure to inform the jury of the pro tanto settlement between the Hospital and the plaintiff so taints the verdict that it must be set aside. (3) Whether the failure of a juror to answer or to respond truthfully to voir dire questions so prejudiced Dr. Campbell as to require a new trial. (4) Whether the testimony of Dr. Alan Dimick should have been precluded at trial. (5) Whether newly discovered evidence that Dr. Dimick had testified falsely entitled Dr. Campbell to a new trial. (6) Whether the mention of insurance by the plaintiff's counsel during closing arguments mandates a new trial. (7) Whether the trial court properly charged the jury on spoliation of the evidence. (8) Whether the trial court properly charged the jury on the definition of "substantial evidence." (9) Whether the jury's verdict is excessive, so as to require remittitur.
Dr. Campbell challenges the Wrongful Death Act, § 6-5-410, on constitutional grounds, alleging that the Act, as applied in this case, violates his right to a trial by jury, his right to due process of law, and his right to equal protection of the laws under the *808 United States Constitution and the Alabama Constitution.
Alabama has had a wrongful death act since 1852, when the legislature passed an act "to prevent homicides," §§ 1940, 1941, Code of Alabama 1852; Central of Georgia Ry. v. Ellison, 199 Ala. 571, 579-80, 75 So. 159, 163 (1916); Tatum v. Schering Corp., 523 So.2d 1042 at 1057 (Ala.1988). An amendment, approved February 21, 1860, was by a later case held to have been expressly made applicable to homicides caused by the "wrongful act, omission or culpable negligence of any officer or agent of any chartered company" (this was the language of § 1941, Code of 1852) as well as to deaths caused by natural persons. The amendment provided in § 2:
"[W]hen the death of a person is unlawfully caused by another, the personal representative of the deceased may maintain an action against the latter at any time within two years thereafter, and may recover such sum as the jury deem just, and the amount so recovered, shall be distributed as personal property of an intestate is now distributed, and shall not be subject to the payment of the debts of the deceased."
That amendment provided in § 3:
"That the right of action hereby given shall survive against the personal representative of the person unlawfully causing the death as aforesaid."
Ala.Acts 1859-60, Act No. 46, p. 42; the case interpreting that amendatory act was Savannah & Memphis R.R. v. Shearer, 58 Ala. 672, 678 (1877) (noting that although amendatory Act No. 46 repealed § 1938 and § 1939 of the 1852 Code, it did not repeal § 1941 of that Code). In 1872, the Alabama legislature re-enacted the statute to prevent homicides to provide for damages in "such sum as the jury deem just" and to correct a mistake of the codifier. See Justice Houston's dissent in Tatum v. Schering Corp., 523 So.2d 1042 at 1056-63 (Ala.1988).
Justice Stone, writing for this Court in South & North Alabama R.R. v. Sullivan, 59 Ala. 272, 279 (1877), explained the purpose of the "act to prevent homicides," as follows:
"Commenting on the act `to prevent homicides' of February 5, 1872, Pamph. Acts 83, we in Savannah and Memphis Railroad Company v. Shearer, said, in effect, that the purpose and result of the suit therein provided were not a mere solatium to the wounded feelings of surviving relations, nor compensation for the lost earnings of the slain. We think the statute has a wider air and scope. It is punitive in its purposes. Punitive of the person or corporation by which the wrong is done, to stimulate diligence and to check violence, in order thereby to give greater security to human life; `to prevent homicides.' And it is none the less punitive because of the direction the statute gives to the damages recovered. The damages, `tis true, go to the estate of the party slain, and in effect, are compensatory; but this does not change the great purpose of the statute `to prevent homicides.' Preservation of lifeprevention of its destruction by the wrongful acts or omission of another,is the subject of the statute; and all its provisions are but machinery for carrying it into effect.
"....
"The language of the statute is, `when the death of a person is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action.' This statute contains no qualifying clauses, limiting its remedial provisions to any class or classes of persons, or excluding any class from its wholesome terms. It employs the word person in its broadest sense, and it would seem that every being falling within that general designation may take shelter under its protecting wings."
The act to prevent homicides was amended in 1886 to read as follows:
"Action for wrongful act, omission, or negligence causing death. A personal representative may maintain an action, and recover such damages as the jury may assess, for the wrongful act, omission, or negligence of any person or persons, or corporation, his or their servants or agents, whereby the death of his testator or intestate was caused, if the testator or intestate could have maintained any action *809 for such wrongful act, omission, or negligence, if it had not caused death; such action shall not abate by the death of the defendant, but may be revived against his personal representative; and may be maintained, though there has not been prosecution, or conviction or acquittal of the defendant for such wrongful act, or omission or negligence; and the damages recovered are not subject to the payment of the debts or liabilities of the testator or intestate, but must be distributed according to the statute of distribution. Such action must be brought within two years from and after the death of the testator or intestate."
§ 2589, Code of Alabama 1886. This Court discussed the changes in the statute from the provision of the recovery of "such sum as the jury deem just" to the recovery of "such damages as the jury may assess" and held that "the change is purely a verbal one, and in no sense material." Richmond & D.R.R. v. Freeman, 97 Ala. 289, 11 So. 800 (1892) (emphasis in original). Justice McClellan, writing for the Court, explained the damages recoverable under the 1872 act "to prevent homicides":
"The damages recoverable being punitive and exemplary in all cases under the statutepunitive of the act done and intended by their imposition to stand as an example to deter others from the commission of mortal wrongs or to incite to diligence in the avoidance of fatal casualties the purpose being the preservation of human life regardless of the pecuniary value of a particular life to next of kin under statutes of distributions, the admeasurement of the recovery must be by reference alone, to the quality of the wrongful act or omission, the degree of culpability involved in the doing of the act or in the omission to act as required by the dictates of care and prudence, and without any reference to, or consideration of the loss or injury the act or omission may occasion to the living. Such is the construction given by this court to the act `to prevent homicide' and as thus construed, it is manifest that the charge set out above is a sound exposition of the elements and measure of damages recoverable under the act unless there has been such modification of the statute in its recent codification as necessitates a different interpretation, or unless the act as thus construed is violative of the organic law as counsel insist."
Richmond & D.R.R. v. Freeman, 97 Ala. at 294, 11 So. at 801. Justice McClellan went on to state that the legislature had not changed the statute since the Court's construction of it, noting that the act of 1872 had been twice re-enacted since the judicial construction of the act in Shearer, Sullivan, and King.[1]
"The act of 1872 having been, without modification in any material sense, twice re-enacted since the judicial construction we have been considering was put upon itin the Code 1876 and again in the Code 1886and being with that construction a constitutional exercise of the legislative power, it is now to be considered as if the terms and provision, which have been evolved out of it and declared in concrete form by judicial interpretation, were expressly embodied in its letter. This, we think should close the door to the overruling of the cases which put that construction on it, and to the adoption of a different one."
97 Ala. at 296, 11 So. at 802. "[T]he legislature had the power to enact a law such as this one is with the construction this court has given it.... It remains for the courts to enforce it as thus constructed and re-enacted...." Id., 97 Ala. at 295, 11 So. at 803.
In Alabama Great S.R.R. v. Burgess, 116 Ala. 509, 22 So. 913 (1897), this Court construed the statute that is now § 6-5-410, Ala.Code 1975, which permits the recovery of "such damages as the jury may assess," to provide that only punitive damages are recoverable in an action for wrongful death.
We have long held that nothing in the wrongful death statute authorizes a jury to apportion damages among joint tort-feasors and that the statute does not recognize degrees of culpability among joint tort-feasors. Tatum v. Schering Corp., supra, at *810 1044-45, citing Bell v. Riley Bus Lines, 257 Ala. 120, 122-24, 57 So.2d 612, 613-15 (1952). The jury in a wrongful death case must return a single verdict that is based, in part, on the total culpability of all defendants. Black Belt Wood Co. v. Sessions, 514 So.2d 1249, 1262 (Ala.1986).[2] Because the statute does not recognize individual degrees of culpability among multiple defendants, however, the jury has no discretion to assess damages against each individual defendant, because without recognition of each defendant's degree of culpability the jury would have no basis on which to apportion damages among the defendants.[3] Contrary to the argument advanced by Dr. Campbell, nonapportionment of damages does not interfere with the right to trial by jury, because the jury has the sole discretion to determine in a wrongful death action the total amount of damages that are appropriate to advance the public interest in the preservation of life. It is within the power of the legislature to authorize juries to make this determination.
The United States Supreme Court, in reviewing our Wrongful Death Act, stated:
"As interpreted by the state court, the aim of the present statute is to strike at the evil of the negligent destruction of human life by imposing liability, regardless of fault, upon those who are in some substantial measure in a position to prevent it.
We cannot say that it is beyond the power of the legislature, in effecting such a change in the common law rules, to attempt to preserve human life by making homicide expensive."
Louis Pizitz Dry Goods Co. v. Yeldell, 274 U.S. 112, 115-17, 47 S.Ct. 509, 510, 71 L.Ed. 952 (1927). The purpose of the law, to protect the lives of Alabama citizens, is a legitimate state interest. Alabama Power Co. v. Turner, 575 So.2d 551 at 556 (1991); cert. denied, 500 U.S. 953, 111 S.Ct. 2260, 114 L.Ed.2d 713 (1991). The nonapportionment of damages among multiple defendants bears a rational relationship to the goal sought to be attained by the statute, the prevention of homicide.
"[I]n a wrongful death action filed against joint tort-feasors, a plaintiff is entitled to a single recovery that will represent the total amount of punitive damages the jury may access for the wrongful death. This total recovery assessed, in an amount determined by the jury as punishment for the homicide, cannot be apportioned among joint tort-feasors."
Tatum, supra, 523 So.2d at 1045.
We note that Alabama has historically treated actions resulting in death differently from actions causing lesser injury. The "enormity of the wrong" justifies the difference in treatment. The Alabama legislature, *811 beginning in 1852, first sought "to prevent homicides" by the enactment of a wrongful death statute. By allowing punitive damages to be assessed against multiple defendants in wrongful death actions without apportionment based upon the degree of culpability of each, the legislature is "attempt[ing] to preserve human life by making homicide expensive." Louis Pizitz Dry Goods Co., supra, 274 U.S. at 116, 47 S.Ct. at 510. Participation in actions causing the death of a human being, even if slight, can result in liability without regard to the degree of culpability, and this result, the legislature believes, will lead to greater diligence in avoiding the loss of life. The legislature has authorized the jury to ascertain an amount of damages appropriate to the goal sought to be achievedpreservation of life because of the enormity of the wrong, the uniqueness of the injury, and the finality of death. Where the enormous wrong results from the combined actions of several tort-feasors, the relative culpability of multiple defendants is only one factor that the jury may consider. Because the policy of this state is to regard human life as being beyond measure in terms of dollars, the jury must disregard the decedent's wealth or lack of wealth, it must disregard the decedent's potential for accumulating great wealth or lack of potential to accumulate wealth; and it must disregard his or her talents and education, or lack of them, as well as his or her station in life. The jury's consideration of the "enormity of the wrong" includes assessing the finality of death, the propriety of punishing the wrongdoer or wrongdoers, whether the death could have been prevented, and, if so, the lack of difficulty that would have been involved in preventing the death, as well as the public's interest in deterring others from committing the same or similar wrongful conduct. Deaton, Inc. v. Burroughs, supra, 456 So.2d at 776.
Dr. Campbell contends that, because the jury is prohibited by law in this case from rendering separate verdicts against each defendant, the jury was unable to assess his individual liability for the death of Ms. Sumpter, and, thus, the $3 million verdict entered against him constitutes more than his fair share of the total liability for her death and is disproportionate to his wrongdoing. He argues that the nonapportionment rule, as applied to him in this case, violates his constitutional rights.
This case went to the jury against three defendants: the Hospital, Dr. Wilfredo Grana, and Dr. Campbell. The jury returned a verdict in favor of Dr. Grana, and against the Hospital and Dr. Campbell. The case was submitted to the jury against the Hospital on three theories: vicarious liability for the alleged negligence of Dr. Grana in failing to perform a tracheostomy; independent negligence for failing to ensure that Dr. Grana was qualified to perform a tracheostomy; and vicarious liability for the alleged negligence of the nurses in failing to enforce the Hospital's policy regarding transfer of burn patients. The case was submitted to the jury against Dr. Campbell on two separate negligence claims: that he deviated from the standard of care 1) by not transferring the patient to the burn unit at U. A. B., as required by the Hospital's policy regarding treatment of major burn patients, and 2) by failing either to examine the patient's airway by use of a fiberoptic bronchoscope, or to intubate the patient.
The jury found in favor of Dr. Grana; therefore its verdict against the Hospital was based either upon the jury's finding that the nurses were negligent in not enforcing the Hospital's policy concerning transfer of burn patients, or upon the Hospital's failure to ensure that Dr. Grana was qualified to perform a tracheostomy. Dr. Campbell's argument that he is bearing a disproportionate share of liability is not persuasive under the facts of this case. The nonapportionment of punitive damages among multiple defendants in wrongful death cases bears a rational relationship to a legitimate state interestthe prevention of homicideand it thus does not violate constitutional guarantees. See Alabama Power Co. v. Turner, supra, 575 So.2d at 556; Killough v. Jahandarfard, 578 So.2d 1041, 1044 (Ala.1991).[4]
*812 The Alabama legislature has had over a century to change the law if it determined that this Court wrongly construed the Wrongful Death Act. It has not changed the law despite impassioned dissents suggesting that it do so. See Carter v. City of Birmingham, 444 So.2d 373 (Ala.1983), cert. denied, 467 U.S. 1211, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984) (Jones, J., dissenting); Tatum v. Schering, supra, at 1046-47 (Jones, J., dissenting) and at 1047-63 (Houston, J., dissenting). Any change in the interpretation of the statute should be left to the legislature. Tatum, supra, at 1044-45; Black Belt Wood Co. v. Sessions, supra, at 1263. Accordingly, we hold that the trial court correctly charged the jury on its role in this case, and we reject the appellant's constitutional arguments.
As we have shown, Alabama has historically permitted juries to assess only punitive damages in wrongful death cases and has not allowed juries to apportion those damages among joint tort-feasors. The legislature has repeatedly refused to alter either of these practices, and its approval of this Court's construction of the Wrongful Death Act convinces us that we should not now change it.
Dr. Campbell next contends that the trial court's failure to advise the jury of the pro tanto settlement between the plaintiff and the Hospital so tainted the jury's final deliberations as to result in a verdict that was "illegal, inappropriate, a sham, and inherently unfair to Dr. Campbell." The record indicates that, after the jury had reached a verdict but immediately before the jury delivered its verdict, Dr. Campbell's attorney asked the trial judge if any pro tanto settlement had been reached between the plaintiff and one of the codefendants, stating that Dr. Campbell "would have the right to plead and [prove]" such a settlement to the jury. The judge replied by saying that no pro tanto settlement had been presented to the court. The plaintiff's attorney failed to disclose that any settlement had been reached; the attorney said the final terms of the settlement were not established at that time.[5]
It is settled law that a person injured by joint tort-feasors may release one or more pro tanto. The tort-feasors may then plead the release as a bar to that amount paid by the released tort-feasor or may place it in evidence, showing payment for the injury up to the amount shown in the release. Bucyrus-Erie Co. v. Von Haden, 416 So.2d 699, 702 (Ala.1982), citing Anderson v. Kemp, 279 Ala. 321, 184 So.2d 832 (1966). This is referred to as the "doctrine of Bucyrus-Erie." Tatum v. Schering Corp., supra, at 1045. In Hardman v. Freeman, 337 So.2d 325 (Ala. 1976), we made it clear that a joint tort-feasor is entitled to post-judgment relief based on a pro tanto settlement and release entered by the other joint tort-feasors, despite the fact that he was unable to plead and prove the pro tanto settlement at trial because the terms of the release were not then final. Id. at 327. The relief to which the joint tort-feasor is entitled is a set-off of the amount of the pro tanto settlement against the amount of the verdict.
Dr. Campbell argues that, because he was unable to plead the pro tanto settlement to the jury, the verdict is invalid. We find no error here. Although under the doctrine of Bucyrus-Erie a defendant would be entitled to plead the release, in this case the defendant did not have the opportunity to place the pro tanto settlement before the jury; therefore, the trial judge simply allowed a set-off of the amount of the pro tanto settlement against the amount of the general verdict in lieu of the settlement being pleaded before the jury. Dr. Campbell received the relief to which he would have been entitled if the pro tanto settlement had been known. Because the trial court gave Dr. Campbell all the relief to which he was entitled when it set *813 off the $1 million pro tanto settlement against Dr. Campbell's liability, we find nothing inherently inappropriate, unfair, or illegal about the verdict against Dr. Campbell or the propriety of the pro tanto settlement.[6]Williams v. Colquett, 272 Ala. 577, 133 So.2d 364 (1961); Hardman v. Freeman, supra, at 327; Bucyrus-Erie Co. v. Von Haden, supra, at 702; Anderson v. Kemp, supra; Tatum v. Schering Corp., supra, at 1045-46.
Dr. Campbell next argues that the failure of juror Bobby Ray Wooten to answer or to respond truthfully to certain questions during voir dire so prejudiced him as to require a new trial.
"The proper inquiry on a motion for a new trial based on improper or nonexistent responses to voir dire questions is whether the response, or lack of response, resulted in probable prejudice to the movant. Not every failure of a prospective juror to respond correctly to a voir dire question will entitle the losing party to a new trial.
"The determination of whether the complaining party was prejudiced by a juror's failure to answer voir dire questions is a matter within the discretion of the trial court and will not be reversed unless the court has abused its discretion. Some of the factors that this Court has approved for using to determine whether there was probable prejudice include: `temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of a juror to recollect, and the materiality of the matter inquired about.'"
Union Mortgage Co. v. Barlow, 595 So.2d 1335, 1342-43 (Ala.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 301, 121 L.Ed.2d 224 (1992) (quoting Freeman v. Hall, 286 Ala. 161, 167, 238 So.2d 330, 336 (1970)) (other citations omitted). The trial court, in its order denying Dr. Campbell's motion for a judgment notwithstanding the verdict, a new trial, or a remittitur, extensively addressed these factors in determining that juror Wooten's failure to answer or to respond truthfully was not prejudicial to Dr. Campbell.[7] After carefully reviewing the record, particularly juror Wooten's post-trial affidavit explaining his failure to answer the questions, and the trial judge's order denying a new trial, we conclude that the trial judge did not abuse his discretion in finding that Dr. Campbell was not prejudiced by juror Wooten's failure to respond.
We next consider whether the trial court abused its discretion in allowing Dr. Alan Dimick, head of the burn unit at U.A.B. Hospital, to testify as the plaintiff's expert witness on the medical standard of care for burn victims, given that he had earlier been consulted by Dr. Campbell's attorneys. The record reflects that when the plaintiff first tried to use Dr. Dimick as her expert witness, the trial court granted Dr. Campbell's motion to preclude Dr. Dimick's testimony. Later, the plaintiff moved the court to reconsider its order precluding the use of Dr. Dimick as the plaintiff's expert witness, and attached Dr. Dimick's affidavit in support of the motion. Dr. Dimick's affidavit states in pertinent part:
"It is true that I was given a copy of Lillie Mae Sumpter's medical chart to review and that I had a meeting with the attorney for Dr. Campbell to discuss my thoughts on the care that was given Mrs. Sumpter. At that time I was not given any additional information which was not contained in the medical chart, nor was I told of any potential defenses or theories of defense which might be raised at trial. The conversation instead centered around my very strong opinion that the case clearly represented substandard care on the part of Dr. Campbell in his treatment of Mrs. Sumpter. Outside of being compensated for my time, I had no further meeting with Dr. Campbell's attorneys concerning this case. At *814 no time did I agree to participate as an expert for Dr. Campbell."
The trial court changed its ruling in light of the fact that Dr. Campbell's counsel had already consulted, but had not retained, the head doctors at both of Alabama's major burn treatment centers, Dr. Dimick and Dr. Arnold Luterman. The trial judge restricted Dr. Dimick's testimony to what was contained within Ms. Sumpter's medical records and precluded him from mentioning that he had been contacted by Dr. Campbell's attorneys. In his order, the trial judge stated, "[I]t appears to this Court that under the unique circumstances of this case, this Court should no longer preclude the testimony of Dr. Alan Dimick, provided his testimony is confined to his opinions based on the medical records in this case."
"The question of whether or not a particular witness will be allowed to testify as an expert is largely discretionary with the trial court, whose decision will not be disturbed on appeal except for palpable abuse." Bowden v. State, 610 So.2d 1256, 1257 (Ala.Cr.App. 1992), quoting C. Gamble, McElroy's Alabama Evidence § 127.01(5)(b) (4th ed. 1991); Ellingwood v. Stevens, 564 So.2d 932, 935 (Ala.1990). After carefully reviewing the record and the trial court's orders on the issue of precluding Dr. Dimick's testimony, we conclude that, under the unique circumstances of this case, the trial court did not abuse its discretion in allowing Dr. Dimick to testify as the plaintiff's expert witness.
Dr. Campbell further contends he is due a new trial on the grounds of newly discovered evidence. Dr. Dimick testified on behalf of the plaintiff that Ms. Sumpter should have been intubated or examined with a fiber optic bronchoscope, and that she would have received this treatment had she been transferred to the U.A.B. burn unit. Dr. Campbell argues that he has newly discovered evidence indicating that one of Dr. Dimick's own burn patients was not intubated or examined with a bronchoscope upon, or soon after, his arrival at U.A.B. The patient, who, like Ms. Sumpter, had suffered second and third-degree burns to the face, died of respiratory failure eight days before the trial of this case.
The trial court, in its order denying a new trial based on this newly discovered evidence, determined that this evidence was not of such a nature that a different verdict probably would result if a new trial were granted. The court noted that the newly discovered evidence would have served merely to impeach Dr. Dimick's testimony, and that another expert had also testified for the plaintiff regarding the proper standard of care.[8]
"In order for a movant to be entitled to a new trial on the ground of newly discovered evidence, the movant must demonstrate that the evidence:
"`1) was discovered after trial;
"`2) could not have been discovered with the exercise of due diligence before trial;
"`3) is material to the issue;
"`4) is not merely cumulative or impeaching; and
"`5) is of such a nature that a different verdict than that already obtained probably would result if a new trial were granted.'
"Welch v. Jones, 470 So.2d 1103, 1112 (Ala. 1985).
"The determination of whether to grant or deny a new trial is for the trial judge, and an order granting or denying a motion for new trial on the basis of newly discovered evidence will not be disturbed on appeal, unless it appears that the trial court abused its discretion. Gilmer v. Salter, 285 Ala. 671, 235 So.2d 813 (1970)."
Talley v. Kellogg Co., 546 So.2d 385, 388 (Ala.1989).
We conclude, after carefully reviewing the record and the trial court's order denying a new trial, that the newly discovered evidence would have served only to impeach Dr. Dimick's testimony as to the proper standard of care. Because the plaintiff's other expert witness also testified as to the proper standard *815 of care, we cannot say that a new trial probably would result in a different verdict. Therefore, the trial court did not abuse its discretion in holding that the newly discovered evidence provided insufficient grounds for a new trial.
Dr. Campbell contends that the mention of insurance during closing argument by the plaintiff's attorney mandates a new trial, and he contends that the mention violated the court's order granting a motion in limine so as to prohibit "all parties, witnesses and attorneys ... from referring in any manner to professional liability insurance."
During closing argument, the following exchange occurred:
"MR. CROWDER [plaintiff's attorney]: Instead of this being a medical malpractice case with a prominent white doctor, and hospital here, assume that this was athis had been a trucking accident, that a truck driver with defective brakes has been going 65 miles an hour in a rainstorm, and had rear ended Lillie Mae Sumpter, and had put her in a coma for five weeks, and then, she died.
"And assume that the insurance adjuster came out to the driver, and said, I want you to change your driving log; instead of showing on the log where you got it that you were driving in the rain for 30 minutes, I want you to change it and show that you suddenly came into this rainstorm. And then, I want you to change your driving log to show that
"MR. ELLIOTT [attorney for one of the defendants]: Excuse me, Mr. Crowder
"MR. CROWDER: to show that you were
"MR. FLORIE [attorney for the defendant Dr. Campbell]: Excuse me, Mr. Crowder, this is all repetitivethis is entirely an improper argument, we object to it, there is a differentthe law is entirely different as it applies to a physician by statute, Mr. Crowder knows that. We object to it, and ask for instructions, and move for a mistrial.
"MR. ELLIOTT: We
"MR. CROWDER: Your honor, I'm giving them an analogy, an analogous situation.
The law would be
"MR. FLORIE: Proper analogy, wholly improper, on the basis of everything he just said
"MR. ELLIOTT: inference based on facts in the case, and that alone, and that is not a legitimate inference based on the facts of this case
"....
"THE COURT: Gentlemen, address the bench with your remarks. Go ahead.
"MR. ELLIOTT: That is not a legitimate inference from the evidence in the case, it's argumentative, prejudicial, we object to it, and we move for a mistrial.
"THE COURT: Motion for a mistrial will be denied.
"Ladies and gentlemen, this action is a negligence case involving the standard of care of a physician and/or a hospital, and the analogy may not be pertinent, but it is the closing argument.
"Go ahead.
"MR. CROWDER: Thank you, Your Honor."
There is no indication from this exchange that defense counsel was objecting to the mention of insurance, unless Mr. Elliott's assertion that the analogy objected to was "prejudicial" was intended to imply that it was prejudicial because of the mention of insurance. Immediately after closing argument, however, and before the trial judge charged the jury, defense counsel reasserted their motion for a mistrial, including in support of their motion, a reference to the plaintiff's mention of insurance during closing argument:
"THE COURT: All right, we are out of the presence of the jury. Is there something for the record?
"MR. FLORIE: Yes, sir, on behalf of Dr. Campbell, Your Honor, immediately upon the close of Mr. Crowder's argument we would renewreassert our motion for a mistrial, on these grounds, separately and severally.
"Mr. Crowder undertook to make an improper and illegal argument posed on an *816 analogy as to a type of tort action for which the law in Alabama imposes an entirely different standard. The duty imposed on a doctor under the Medical Liability Act applicable to this case is a different standard, different duty, and [is] imposed by statute, entirely separate and apart upon a trucking company [sic]. He made reference by analogy to the Department of Transportation regulations, which are ... nowise analogous or applicable to Dr. Campbell in this case. Hea blatant violation of the Court's motion in limine to reference insurance and insurance adjusters, and changing on insurance adjusters and he did in such a manner so as to make it impossible for any defendant in this case to speak in the presence of the jury without risk of overwhelming prejudice, and to address the question of insurance, Your Honor ruled on that in the motion in limine, was an intentional affront to that ruling, and we move for a mistrial.
"MR. ELLIOTT: I join in the motion, I adopt the grounds stated by Mr. Florie.
"....
"THE COURT: Gentlemen, your motion for a mistrial is denied."
We must determine whether this mention of insurance was sufficiently prejudicial to require a mistrial or a new trial.
"The issue of whether to grant a mistrial generally rests within the sound discretion of the trial court. The reason for the rule is well advanced in Burnett v. Bledsoe, 276 Ala. 139, 159 So.2d 841 (1964), where the Court explained:
"`The cases where insurance is mentioned in civil actions during the trial are numerous but the determining factor is whether or not a remark concerning insurance is prejudicial. The governing rule with reference to all remarks of counsel before the jury is thus stated in Birmingham Electric Co. v. Perkins, 249 Ala. 426, 430, 31 So.2d 640, 642:
"`"The trial court was present and was an eyewitness to all of the proceedings and in overruling the defendant's motions in effect found that the remarks were not prejudicial to the defendant. Therefore the action of the trial court in denying the motions for mistrial and in overruling the motions for new trials will not be disturbed by this court unless it affirmatively appears from the entire record that the statements involved were [probably] prejudicial....'"
"....
"A review of the instances in which liability insurance was injected into a civil case discloses that the trial court's focus is upon prejudice, i.e., was the defendant prejudiced to such an extent that the improper influence of the subject of insurance was ineradicable from the minds of the jurors?"
Thompson-Weinman & Co. v. Robinson, 386 So.2d 409, 411 (Ala.1980) (citations omitted).
"In reversing a denial of a new trial, this Court has stated: `[W]ith reference to an argument made by counsel emphasizing the existence of insurance carried by his opponent covering the transaction, this Court has taken the position that the influence is ineradicable.' Thorne v. Parrish, 265 Ala. 193, 195, 90 So.2d 781, 783 (1956) (citations omitted). The principle that reference to indemnification or insurance of an opposing party is highly prejudicial and grounds for a mistrial or a new trial is firmly established."
Cook v. Anderson, 512 So.2d 1310, 1311 (Ala. 1987) (emphasis added) (citations omitted); Williston v. Ard, 611 So.2d 274, 278 (Ala. 1992). We held in Cook that a new trial was required because the plaintiff's attorney made a statement referring to the defendants' insurance policy and that statement "improperly suggested to the jury that the individual defendants would be indemnified for any liability imposed upon them in the case." 512 So.2d at 1312. We do not see how the unfortunate reference by the plaintiff's counsel to an insurance adjuster in an analogy made during closing argument would have suggested to the jury that Dr. Campbell had professional liability insurance or that he would be indemnified for any liability imposed upon him. Moreover, Dr. Campbell's attorney did not specifically request a curative instruction on insurance, and, if he did intend to do so, he did not object when the trial court failed to instruct the jury about insurance when it instructed the jury about *817 counsel's analogy to a truck driver. After carefully reviewing the entire record, we cannot say that the mention of insurance probably prejudiced Dr. Campbell. Therefore, we conclude that the trial court did not abuse its discretion in refusing to grant a mistrial or a new trial because of the mention of insurance.
We next look to see whether the trial court erred in instructing the jury on spoliation of the evidence over Dr. Campbell's objection that the charge was not supported by the evidence or any reasonable inference therefrom.[9] Dr. Campbell cites in support of his contention Shannon v. Hollingsworth, 291 Ala. 159, 279 So.2d 428 (1973), which states that "it is error to hypothetically instruct a jury on a state of facts when there is no evidence to establish them." 291 Ala. at 165, 279 So.2d at 434.
The trial court, in its order denying Dr. Campbell's motion for a judgment notwithstanding the verdict, or a new trial, or a remittitur, stated:
"As to the involvement of Dr. Campbell in a possible cover-up or concealment, the Court must disagree with Dr. Campbell's assertion that there was no evidence presented of such cover-up or concealment. Evidence was presented that Dr. Campbell asked another physician, Dr. Richard Gallo, to correct Dr. Gallo's notes which had indicated that Ms. Sumpter suffered a gradual closing-off of her airway. Dr. Campbell asked Dr. Gallo to change the notation so as to reflect that Ms. Sumpter suffered a sudden onset of the closing-off of her airway. [R.T. 959-61.] Additionally, Dr. Campbell's written report stated that Ms. Sumpter had respiratory arrest following a coughing spell. This was in contrast to the testimony of the nurse on duty who denied any coughing spell. [R.T. 106-08.] While this evidence may not indicate an attempt to conceal facts about Ms. Sumpter's treatment, this Court cannot with assurance say that the jury did not consider that concealment existed and punished accordingly."
The trial court did not err in charging the jury on spoliation of the evidence, because there was evidence in the record to support the giving of the charge.
Dr. Campbell next contends that the trial court erred in instructing the jury on the definition of "substantial evidence" as that term is used in the Alabama Medical Liability Act of 1987, Ala.Code 1975, § 6-5-542(5). He argues that the jury should have been given the definition of "substantial evidence" as it appears in the General Tort Reform Act, § 12-21-12(d).
The Medical Liability Act of 1987 applies to all causes of action against health care providers that accrue after June 11, 1987. Clements v. Dr. John Alvan Stewart, P.C., 595 So.2d 858, 862 (Ala.1992). Because Ms. Sumpter died in April 1987, the cause of action for her wrongful death accrued before the Medical Liability Act of 1987 became applicable. However, this Court has held that the difference between the definition of "substantial evidence" given in § 6-5-542(5) and the definition of the same term given in § 12-21-12(d) is a "difference without distinction," Clements, supra, 595 So.2d at 862. Therefore, any error was harmless. Ala. R.App.P. 45; Industrial Risk Insurers v. Garlock Equip. Co., 576 So.2d 652 (Ala.1991).
Finally, Dr. Campbell argues that the amount of the jury verdict for which he may be held personally liable would financially destroy him and is so large as to be excessive and therefore to require a remittitur. The trial court, in its order denying the request for remittitur, addressed the issue of excessiveness, applying the factors set forth in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).
"Because the purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and to deter the wrongdoer and others from committing *818 similar wrongs in the future, the proper amount of punitive damages rests largely within the jury's discretion. However, although punitive damages need bear no particular relationship to actual damages, they, nonetheless, must not exceed an amount that will accomplish society's goals of punishment and deterrence. Green Oil Co. v. Hornsby, supra."
Wilson v. Dukona Corp., N.V., 547 So.2d 70, 73 (Ala.1989).
The trial court addressed the Hammond-Green Oil factors, using a four-step approach. First, the court analyzed the impact of the verdict on Dr. Campbell, noting that, after deducting from the $4 million verdict the $1 million settlement between the Hospital and the plaintiff and the $1 million in insurance coverage held by Dr. Campbell, Dr. Campbell would be personally liable for $2 million. Dr. Campbell's financial statements submitted to the court indicated that his net worth in 1992 was over $1 million and that his annual income exceeded $525,000. The trial court, stating in its order that "the purpose of punitive damages is not to destroy but rather to meet societal goals [of punishment and deterrence]," concluded that the impact of the verdict on Dr. Campbell was not sufficient to overcome the presumption of correctness in favor of the jury's verdict.
The court next addressed Dr. Campbell's conduct, viewing his professional treatment of Ms. Sumpter separately from his conduct concerning any alleged cover up or concealment of the circumstances surrounding Ms. Sumpter's death. The court noted that Dr. Campbell undertook to be diligent in treating Ms. Sumpter, and it did not consider his conduct in treating her to be reprehensible conduct. However, the court noted that the jury could have considered Dr. Campbell's role in any alleged cover up or concealment and punished him accordingly by its award of punitive damages.
The court then noted that no mitigating factors were presented for consideration. Finally, the court compared the verdict in this case with other verdicts awarding punitive damages. Although the verdict in this case was the highest verdict returned in a medical malpractice wrongful death case in Etowah County, the court noted that, in light of the verdicts awarded in other punitive damages cases, the verdict against Dr. Campbell was not so high as to require remittitur. The court concluded that "[u]pon consideration of the factors relevant to remittitur, the Court finds that the Defendant has not overcome the presumption of correctness of the jury's verdict," and denied a remittitur.
From a review of the trial court's findings and from our independent review of the evidence, applying the Green Oil standards, we conclude that the $4 million punitive damages award in this case does not exceed an amount necessary to punish Dr. Campbell for his action and to deter him and others from committing similar acts in the future. Therefore, we affirm the trial court's denial of a remittitur.
AFFIRMED.
HORNSBY, C.J., and KENNEDY, INGRAM and COOK, JJ., concur.
MADDOX and HOUSTON, JJ., dissent.
MADDOX, Justice (dissenting).
This case was initially assigned to me, and I reached the same conclusion that the majority reaches on every issue except one: the failure of the trial court to inform the jury of the pro tanto settlement. The majority addresses this issue as follows:
"Dr. Campbell argues that, because he was unable to plead the pro tanto settlement to the jury, the verdict is invalid. We find no error here. Although under the doctrine of Bucyrus-Erie, a defendant would be entitled to plead the release, in this case the defendant did not have the opportunity to place the pro tanto settlement before the jury; therefore, the trial judge simply allowed a set-off of the amount of the pro tanto settlement against the amount of the general verdict in lieu of the settlement being pleaded before the jury. Dr. Campbell received the relief to which he would have been entitled if the pro tanto settlement had been known. Because the trial court gave Dr. Campbell all the relief to which he was entitled when it *819 set off the $1 million pro tanto settlement against Dr. Campbell's liability, we find nothing inherently inappropriate, unfair, or illegal about the verdict against Dr. Campbell or the propriety of the pro tanto settlement. Williams v. Colquett, 272 Ala. 577, 133 So.2d 364 (1961); Hardman v. Freeman, [337 So.2d] at 327; Bucyrus-Erie Co. v. Von Haden, [416 So.2d] at 702; Anderson v. Kemp, [279 Ala. 321, 184 So.2d 832 (1966)]; Tatum v. Schering Corp., [523 So.2d] at 1045-46."
638 So.2d at 816-17.
The Court stated in Tatum v. Schering Corp., 523 So.2d 1042, 1045 (Ala.1988):
"[A] person injured by joint tort-feasors may accept partial satisfaction and release one or more pro tanto and proceed against the other; however, the tort-feasors not so released may plead the release as a bar to that amount paid by the released tort-feasor(s) or may place it in evidence to show payment for the injury up to the amount shown in the release."
See also, Bucyrus-Erie Co. v. Von Haden, 416 So.2d 699, 702 (Ala.1982) ("In lieu of allowing [the] defendant to place the pro tanto settlements into evidence, the trial court properly informed the jury of the total amount of the settlements...."). Thus, a defendant has a right to have the jury informed of the fact of a pro tanto settlement between the plaintiff and another defendant. The fact that in this case the plaintiff and the Hospital waited until the close of the evidence to agree to the settlement should not affect Dr. Campbell's right to have the jury informed of the settlement. As long as the settlement is reached before a verdict is returned, the trial court should inform the jury of the settlement and instruct it accordingly. To hold otherwise would allow the settling parties to wait until the close of evidence to settle and thus avoid having the jury notified of the pro tanto settlement, thereby obstructing the nonsettling defendant's right to inform the jury of the settlement. Furthermore, the failure of the settling parties to disclose a settlement agreement to the nonsettling defendant could violate the rules governing discovery. See Rule 26(e)(2), Ala. R.Civ.P.
The Alabama Wrongful Death Statute, § 6-5-410, Ala.Code 1975, has a dual purpose of "punishment based on the quality of the wrong" and "punishment based upon the wrong or degree of culpability." Black Belt Wood Co. v. Sessions, 514 So.2d 1249, 1262 (Ala.1986). If this purpose is to be carried out, the jury must be informed of a codefendant's pro tanto settlement entered into before the verdict is returned, because otherwise a nonsettling defendant could be punished unfairly. I do not express any opinion as to whether the nondisclosure of the settlement to the jury in this case prejudiced Dr. Campbell. I would hold only that he had a right to present it to the jury, that it could have significantly affected the verdict, and that the trial court erred in not informing the jury of the pro tanto settlement. Therefore, I dissent from the Court's opinion on this issue and from the result reached in this case.
HOUSTON, Justice (dissenting).

Punitive Damages and a Single Defendant
I agree with Justice Scalia, in his observation that the majority of the United States Supreme Court in TXO Production Corp. v. Alliance Resources Corp., ___ U.S. ___, ___, 113 S.Ct. 2711, 2727, 125 L.Ed.2d 366 (1993), approved procedures for upholding the constitutionality of punitive damages that were "far less detailed and restricted than those upheld in [Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)]" (Scalia, J., with Thomas, J., concurring in the judgment). We no longer have to worry about the relationship of the amount of compensatory damages to the amount of punitive damages, which never made sense to me, for it did not foster the purpose of punishing and deterring. I also agree with Justice Kennedy that the United States Constitution "does not concern itself with dollar amounts, ratios, or the quirks of juries in specific jurisdictions." TXO, ___ U.S. at ___, 113 S.Ct. at 2724 (Kennedy, J., concurring in part and concurring in the judgment). A plurality of the United States Supreme Court takes the position that there exists "a substantive due process right that punitive damages be reasonable." TXO, ___ *820 U.S. at ___, 113 S.Ct. at 2726. I believe that under Haslip, as explained by TXO, if a jury is instructed to consider the gravity of the defendant's wrong and the need to deter similar wrongful conduct and the jury's determination is reviewed by trial and appellate courts to ensure that the jury verdict is reasonable, a defendant has received all the process the defendant is due, procedurally and substantively.

Punitive Damages and Two or More Defendants
However, in my opinion, the procedure for assessing punitive damages in Alabama, when there is more than one defendant, violates the guarantee of procedural due process under the United States and Alabama Constitutions, regardless of the amount of the award. "[T]o punish the guilty beyond their guilt is not different from punishment of the innocent, and it cannot be done in a manner consistent with ordinary notions of justice." Dan B. Dobbs, "Ending Punishment in `Punitive' Damages: Deterrence-Measured Remedies," 40 Ala.L.Rev. 831, 854 (1989). When we do not punish based upon the particular wrong of a particular defendant, that defendant does not receive due process; and government is not protecting the citizen in the enjoyment of his property, when there is no life, liberty, or property interest of a plaintiff or any other citizen involved. To me, this violates "the sole object and only legitimate end of government." Art. I, § 35, Alabama Constitution of 1901.

Punitive Damages, Wrongful Death, and Two or More Defendants
Under the majority's interpretation of the Alabama Wrongful Death Act, death is an indivisible injury, requiring a single verdict, fixing a lump sum regardless of the (individual) culpability of tort-feasors.
When confronted head-on with the argument that any settlement by a personal representative with any tort-feasor satisfies the societal interest of punishing for that death and prohibits the personal representative from recovering from any other tort-feasor, the majority of this Court in Tatum v. Schering Corp., 523 So.2d 1042 (Ala.1988), held that it did not, since "the remaining defendant would be entitled to plead the release in bar to the amount paid by the released tort-feasors, or that defendant could place it in evidence to show payment for the injury [death] up to the amount shown in the releases." The majority added, "Under the doctrine of Bucyrus-Erie Co. [v. Von Haden, 416 So.2d 699 (Ala.1982) ], the court, in lieu of allowing the defendant to place the pro tanto settlements into evidence, could instruct the jury on the total amount of the settlements, as was done in Bucyrus-Erie." 523 So.2d at 1045-46.
If, in this case, the $4 million judgment is allowed to stand and $3 million of that is assessed against Dr. Campbell, the plaintiff and a defendant will have been permitted to apportion a nonapportionable verdict, which Tatum permits only a jury to do. Therefore, I must dissent.
By not apportioning punitive damages in a wrongful death action, we have focused on the result (the death) of the tort-feasor's wrongful acts, omissions, or negligence, rather than on the wrongful acts, omissions, or negligence of the tort-feasor. Yet, juries are instructed that "The amount of damages should be directly related to the amount of wrongdoing on the part of the defendants." Alabama Pattern Jury Instructions: Civil § 11.18.
Juries must then assess the wrongdoing of each defendant and combine that assessment into a finding of the total wrongdoing that results in death. After that is done, the jury must then decide if it, in its uncontrollable discretion, desires to award punitive damages (this fact concerns me, because I would think death is a compensable injury). If the jury wishes to award damages, then it must arrive at one sum that is directly related to the combined amount of wrongdoing on the part of the defendants. This sum stands, no matter how small it may be (this fact, too, concerns me, because I think death is a compensable injury). However, if the sum is challenged as being excessive, then there must be a Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), hearing and the trial court must test the punitive award by the factors set out in Hammond; Green Oil Co. *821 v. Hornsby, 539 So.2d 218 (Ala.1989); and Ala.Code 1975, § 6-11-23(b). If there is an appeal and excessiveness of the award is an issue, then this Court must test the punitive award by the factors set out in Green Oil and Ala. Code 1975, § 6-11-24(b). This provides sufficient constitutional protection for a single defendant. Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). However, what if a defendant or some defendants, but fewer than all defendants, settle with a plaintiff in a wrongful death case and the nonsettling defendant or defendants are prohibited from pleading the pro tanto release in bar to the amount paid by the settling defendants, and the Court refuses to instruct the jury on the total amount of the settlements? Then, in my opinion, the jury punishes for the combined wrongdoing, without knowing that a dollar amount has been fixed for the wrongdoing of some, but not all, of the defendants. The jury must know what amount was paid for the wrongdoing of the settling defendant or defendants, or else the jury may punish the nonsettling defendant or defendants for the wrongdoing of the settling defendant; to do so would, in my opinion, violate the nonsettling defendant's rights under §§ 13 and 35 of the Alabama Constitution.
The mere fact that this Court prohibits apportionment of punitive damages among wrongdoers, insofar as recovering punitive damages from joint tort-feasors is concerned (which fact causes me some constitutional concerns), did not seem to concern this Court, when in Tatum it, in effect, directed that a jury must apportion punitive damages to overcome the argument that death is an indivisible injury and that settlement with one or more tort-feasors satisfied the societal interest of civilly punishing for that indivisible injury. In Tatum, I realized that it was impossible to apply legal reasoning to our judicially construed wrongful death statute, and, in my dissent, I begged for a return to bedrock in interpreting the wrongful death statute. 523 So.2d at 1047-63.
Because I cannot apply legal reasoning to the judicial interpretation of the damages awarded under our wrongful death statute, as a pragmatist I would affirm upon the condition that the plaintiff and Dr. Campbell agree to a remittitur of $2 million. That way, the hospital and Dr. Campbell would each pay $1 million. If neither the plaintiff nor Dr. Campbell accepted that, then I would order the case retried and in a retrial of the claim against Dr. Campbell the settlement between the hospital and the plaintiff would be admissible.
NOTES
[1] East Tenn., Va. & Ga. R.R. v. King, 81 Ala. 177, 183, 2 So. 152 (1886).
[2] Dr. Campbell misunderstands Black Belt Wood as indicating that the degree of each defendant's culpability must be reflected in the jury's assessment of damages. This, however, is tantamount to apportionment of damages among joint tort-feasors, and thus cannot be the proper interpretation. The source of this confusion is the following quote from Black Belt Wood: "The purpose of Alabama's wrongful death statute, of course, has been two-fold: (1) punishment based on the quality of the wrong, and (2) punishment based upon the wrong or degree of culpability. "Black Belt Wood Co., 514 So.2d at 1262 (emphasis added). Reference to the cases relied on in Black Belt Wood for this statement clearly indicates that "degree of culpability" is meant to refer to the propriety of punishing the wrongdoer (i.e., is the wrongdoer sufficiently culpable?), and not to the individual amount of responsibility that each defendant contributed toward the total harm done:

"In a wrongful death action brought under Code 1975, § 6-5-410, the only damages recoverable are punitive in nature, and the amount thereof is determined by the gravity of the wrong done, the propriety of punishing the wrongdoer, and the need for deterring others from committing the same or similar wrongful conduct."
Deaton, Inc. v. Burroughs, 456 So.2d 771, 776 (Ala.1984), citing Estes Health Care Centers, Inc. v. Bannerman, 411 So.2d 109, 112 (Ala.1982).
[3] Prosser, in his treatise on torts, indicates that apportionment should never be allowed in a wrongful death action:

"Certain results, by their very nature, are obviously incapable of any reasonable or practical division. Death is such a result, and ... [n]o ingenuity can suggest anything more than a purely arbitrary apportionment of such harm. Where two or more causes combine to produce such a single result, incapable of any reasonable division, each [responsible party] may be a substantial factor in bringing about the loss, and if so, each is charged with [liability for] all of it."
W. Page Keeton et al., Prosser and Keeton on Torts, at 347 (5th ed. 1984) (footnotes omitted).
[4] These cases both held that the exception of wrongful death actions from the $250,000 cap on punitive damages imposed under § 6-11-21 (held unconstitutional in Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993)), did not violate a wrongful death defendant's equal protection rights because the exception bore a rational relationship to the legitimate state interest in preventing homicides.
[5] The plaintiff's contention was, apparently, that no firm settlement existed because the amount of the settlement was dependent on the jury's verdict. Dr. Campbell could not object to the trial court's refusal to inform the jury of the settlement because the court was not informed of the existence of any settlement about which he could instruct the jury. Therefore, Dr. Campbell's counsel did all that was possible in order to preserve this issue for appeal.
[6] In Bucyrus-Erie, in lieu of allowing the defendant to place the pro tanto settlements into evidence, the trial court informed the jury of the settlements and instructed it to subtract the figure from the full amount of damages, if any, to be awarded by the plaintiff.
[7] The trial court's analysis indicates that the failure to answer or to respond truthfully was due to inadvertence based on an honest misunderstanding of an ambiguous question, as well as on temporal remoteness and a failure to recollect.
[8] The trial court also noted that there were differences between the conditions of the two burn victims and that Dr. Dimick had testified that a treating physician should be allowed to use his judgment in determining how to treat a burn victim, based on the circumstances of the case, and that intubation or bronchoscopy was not always required treatment for a burn victim.
[9] The court charged the jury as follows:

"Ladies and gentlemen, spoliation or an attempt to express [suppress?] material evidence, by a party or parties to a suit, favorable to the adversary is sufficient foundation for inferences of their guilt or negligence. The fact may be established by direct or circumstantial evidence, and proof is sufficient if from the facts and circumstances adduced it can be reasonably inferred." (T.R. 1666.)